# CHARLESTON.

McPeck v. Graham.

Submitted June 16, 1904. Decided November 15, 1904.

1. Pleading—*Insufficient Bill—Duress and Fraud.*
   A general charge of duress or fraud in a bill, without statement of facts constituting it, is not sufficient. (p. 201).

2. Insane Person—*Contract.*
   A confirmed insane person may, in a lucid interval, make a valid contract. (p. 203).

3. Insane Person—*Contract.*
   If insanity is occasional and intermittent, the presumption of insanity at the time of making a contract does not prevail, and he who relies on insanity proven to have existed at another prior time must also prove its existence at the time of the contract. (p. 203).

4. Laches—*Separate Estate.*
   The defense of *laches* is applicable in equity to a married woman as to her separate estate. (p. 205).

Appeal from Circuit Court, Preston County.

Bill by Melinda McPeck's heirs against David Graham's heirs. Decree for plaintiffs, and defendants appeal.

*Reversed.*

Wm. G. Brown and P. J. Crogan, for appellants.

R. W. Monroe, for appellees.

Brannon, Judge:

On 22nd of May, 1888, David Graham conveyed to Melinda McPeck, wife of William McPeck, a tract of one hundred and thirty and one-half acres of land in Preston County in consideration of land owned by William McPeck and conveyed by him to Graham. By deed dated 25th of April, 1889, in consideration of $1,175 recited in the deed as the indebtedness of McPeck and wife to Graham, McPeck and wife conveyed back to Graham said one hundred and thirty and one-half acres. Graham died in 1892. In June, 1896, a suit began in the circuit court of Preston county in the name of Melinda McPeck against the represen-

tatives of Graham to cancel the deed from herself and husband to Graham. Pending the suit Mrs. McPeck died, and it was revived in the names of her heirs. A decree was pronounced avoiding the deed. The bill alleged that Mrs. McPeck was mentally incompetent to make the deed. The representatives of Graham took an appeal.

There is some evidence intended to show that Mrs. McPeck was unwilling to sign the deed to Graham, but was forced to do so by her husband by a threat that he would take his pension and leave the family without support, he receiving a pension as a soldier; but we need not consider coercion as an independent ground of relief on the theory of fraud or duress, because it is not a basis of relief made by the bill. No feature of the bill approaches that basis of relief save the too general charge that "David Graham improperly procured this plaintiff to attempt to convey to him the said tract of land for a pretended consideration of $1,175." How he improperly did so the bill does not say. This does not specify the facts constituting fraud or duress. *Zell Co.* v. *Heatherly,* 38 W. Va. 409; 7 Ency. Pl. & Prac. 247. It would be pertinent to undue influence, if charged, but it is not charged.

We must treat the bill as grounded alone on the insanity of Mrs. McPeck. Was she mentally competent to make the deed? A basic rule, at the outset, is, that it is a legal presumption that the grantor in a deed was sane and competent to make it at the time when made, and he who asserts the contrary must fully and clearly prove it. *Delaplain* v. *Grubb,* 44 W. Va. 612; *Snodgrass* v. *Knight,* 43 *Id.* 294. To one reading the lengthy evidence it must be plain that not only is this legal presumption going to sustain the deed not overthrown, but the weight of the evidence, the preponderance, goes decidedly the other way. We cannot lightly overthrow muniments of men's titles on trivial evidence, leaving the mind unwilling to do so. The depositions show seven non-expert, non-professional witnesses testifying in a general way, that, in their opinion, Mrs. McPeck was not sane. They give no defined reasons. They say she was eccentric; would stand and say nothing; would take children and wander over premises when visiting, and say nothing to people, and stand silent and apparently troubled. No violent action was shown, no raving mania. We can explain her silence and melacholy on

rational ground. In February, 1888, her son died, and she was greatly troubled over his death, as the plaintiffs proved by one of her sons. He says she was insane. The strongest manifestation of insanity which he gives, or which the record discloses, is that he says: "The first I noticed of her being rattled was about six weeks after Charley died. She was laying in bed one night, and I heard her say she could see him in heaven; she could hear him call her." Is it to be received as even a token of insanity that this illiterate, unread, bereaved mother, while brooding on her restless bed in the stillness and solitude of the night, should seem to see her lost son and hear his call for his mother even from heaven? How many cultivated, educated, favored mothers lying on soft couches under guilded canopies, stung with a like grief, see similar apparitions and think they hear the voices of loved ones in the still watches of the night? It may argue superstition, or excessive or diseased imagination; but does it prove that she knew not what she did when conveying her land? That she did know, the plaintiffs' evidence, if true, fully proves. A son says that when the deed was brought to the house his mother objected, when the father told her that she would have to sign the deed, as judgments would be rendered against him next day. This son, strange to say, does not say she was incompetent. By another son it is proven that she flatly declined to sign, and was told by his father that she would have to do so. By other evidence still the plaintiffs sought to show that she refused to sign the deed, but was induced to do so by fear of creditors of her husband attacking the land as purchased with his means and vested in her to cheat them, and by threat of the husband to deprive the family of the benefit of his pension, and leaving home. Now, this evidence, if true, and it is claimed by the plaintiffs to be true, proves that she knew the effect of the deed, and establishes her mental capacity to execute it. It shows that at the very moment of the execution of the deed she knew its character, and that is the moment of time, above all other times, that controls in deciding upon capacity. *Delaplain* v. *Grubb,* 44 W. Va. 612. This evidence of the plaintiff ought alone sustain the deed. There is evidence that Mrs. McPeck's mother, grandmother and aunt committed suicide; evidence that some years before she was committed to a hospital in Pennsylvania. In July, 1890, she became worse, as all say, and at Christmas, 1890, was committed to

the Weston hospital as an insane person, but the next spring
returned home and seemed all right till her death. She told several persons that she had conveyed the land, and that the bargain
was that she was to give possession in the spring. She told all
about it. She said she was under obligations to Graham. Thus,
it is clear that for the bulk of the time she was sane, and her
spells of insanity transient. By the great preponderance of evidence she was not insane at the date of the deed, April, 1889,
and did not become so till July, 1890. The physician and justice
who later pronounced her a fit subject for the Weston asylum so
state, and from the evidence it is clear. Ellen Radabaugh, a
witness for the plaintiff, who pronounced her insane, says she
first noticed her insanity in July, 1890. One of her sons says
she became so in July, 1890. Margery Moser says she was insane in April, 1889, but also says she was sent to Weston the
winter after this April, and as it is fixed beyond question that
Mrs. McPeck went to the Weston asylum in December, 1890, we
must say that the point of time fixed by Margery Moser for her
insanity was really April, 1890, not 1889. So, it is clear that
the insanity did not exist when the deed was made, but came on
later. If she ever was insane before, and it is not clearly shown
that she was, for years she was restored, and was sane again after
a few months spent at Weston. Even one habitually insane has
sometimes lucid intervals, and is then capable of contracting.
Bishop on Contracts, §959. The insanity of Mrs. McPeck, at
utmost, was not confirmed. "If the malady is occasional or intermittent in its nature, the presumption (of continuance) does
not arise, and he who relies on insanity proved at another time
must prove its existence also at the time alleged." 16 Am. &
Eng. Ency. L. (2d Ed.) 606. As stated above, the fact that she
objected to the deed shows her capacity. And a son, Frank,
swears that when he came home to dinner on the day, in the
morning of which the deed was made, he found his mother crying, and she told him all about the deed; told him that they had
come unexpected to her, and she told them she would not sign
the deed; that the farm was her home; that she received nothing
for it; that her husband said for her to sign it, and stood over
her and told her she had to sign it or he would take his pension
and leave, and she told him when she signed it she was doing so
against her will. This shows her full comprehension of the act.

There are seven witnesses giving the opinion, the mere opinion, that Mrs. McPeck was incompetent. They state few facts to sub-stantiate such opinions. Mere opinions of non-expert witnesses, not supported by good reasons on facts warranting them, are en-tled to little or no regard. If such reasons and facts, as in this case, are frivolous, the opinions are worth little or nothing. *Jar-rett* v. *Jarrett,* 11 W. Va. 584; *Kerr* v. *Lunsford,* 31 *Id.* 659. These witnesses give no substantial facts. Two of those to sus-tain the suit are sons and heirs of Mrs. McPeck, deeply interested in the suit.

The defense introduced eleven witnesses, all well acquainted with Mrs. McPeck, and seeming impartial and fair, who fully sustain her competency. One of them was a justice, notary, school teacher and farmer, of evident intelligence. He took the acknowledgment to the deed and is clear in stating Mrs. Mc-Peck's competency. The cases say that the evidence of the of-ficer taking an acknowledgment is entitled to peculiar weight on the question of a grantor's capacity. *Buckey* v. *Buckey,* 38 W. Va. 168. President Pendleton, in *Beckwith* v. *Butler,* 1 Wash. (Va.) 286, holds this rule, telling us of an early case where the evidence of such an officer overcame all other evidence before and after the deed. This witness is the same justice who afterwards committed Mrs. McPeck to the Weston asylum. And her family physician, whose evidence afterwards sent her to Weston, gives evidence that at the date of the deed she was competent. These witnesses say her insanity did not occur till the summer of 1890, in July, more than a year after the deed.

It adds strength to the defense that Graham sold this land back to William McPeck by title bond, 4th July, 1889, and on 4th October, 1893, Mrs. McPeck signed her name as a party to it. She thus treated Graham as owner, and thus when she was con-fessedly sane recognized her deed.

It appears probable from the whole case that the husband of Mrs. McPeck caused this deed to be made to Graham to protect the land from creditors, and that it was the sedate act of both husband and wife. The justice says that when he was at their house to take the acknowledgment McPeck and wife retired and consulted. This land had been paid for, as all admit, and the deed to Mrs. McPeck from Graham states, with the husband's property, and was thus liable to creditors; and later McPeck

wanted to get back the property. He was active in the suit.. The wife was not. He never sued while Graham lived to give his version, and defend his right. He waited till the man who befriended him was in his grave. Several witnesses swear that. he offered to bribe them to give evidence of his wife's insanity. We cannot overthrow the deed on the ground of insanity. And if duress were involved, the only undue influence was that of the husband, with which Graham could not be chargeable.

Another sufficient reason against the case of the plaintiffs is *laches*. It was more than seven years from the deed to the suit, and four years after Graham's death. It was more than five years from Mrs. McPeck's return from the Weston hospital till suit. It is proven that Mrs. McPeck was sane after such return until her death. She gave an intelligent deposition. When the suit began Graham was dead and unable to speak. Circumstances had changed. He was never attacked until after death.. How long are titles to remain in uncertainty? Diligence, not lethargy and sleep, is required. *Bryant* v. *Grove,* 42 W. Va. 10; *Christian* v. *Vance,* 41 *Id.* 754. No excuse for such delay is given. A married woman, as to her separate estate or right, is subject to *laches.* The statute of limitation excepts her, but not as to separate estate, and she is under the bar of *laches,* as applied in equity. *Phillips* v. *Piney Co.,* 53 W. Va. 543; *Waldron* v. *Harvey,* 54 *Id.* 608; 18 Am. & Eng. Ency. L. (2d Ed.) 107;. *McKneely* v. *Terry,* 3 Am. & Eng. Dec. in Eq. 391.

We reverse the decree and dismiss the bill.

*Reversed.*