# CHARLESTON.

## CARRIGAN, COMMITTEE, v. DAVIS

Submitted September 9, 1919.  Decided September 16, 1919.

1. DEEDS—*Capacity to Make Deed.*
   A person is mentally competent to make a conveyance of land if he knows the nature, character and effect of his deed.  (p. 475).

2. SAME—*Burden of Proof—Fraud.*
   The presumption of law is in favor of the sanity and mental capacity of a grantor, and the person attacking his conveyance on the ground of his incapacity, or the exertion of undue influence over him in inducing him to make the deed, bears the burden of proof.  One who charges fraud and undue influence must prove it.  (p. 475).

3. INFANTS—*Loan to Infant—Ratification by Conveyance—Consideration.*
   An infant's contracts are not void, but voidable at his election, and money loaned to an infant, whether to supply himself with necessities or not, is good consideration for a conveyance of land made after he attains his majority.  (p. 475).

Appeal from Circuit Court, Marshall County.

Action by Charles E. Carrigan, committee, against William Davis.  Decree for plaintiff and defendant appeals.

*Reversed, and bill dismissed.*

*J. Howard Holt,* for appellant.

*Everett F. Moore,* and *J. B. Allison,* for appellee.

Everett F. Moore and J. B. Allison for Appellee relied on the following propositions and authorities in support thereof:

Whenever there exists between parties confidence on the one hand and influence on the other, from whatsoever cause they may spring, equity requires in all dealings between them the highest degree of a good faith on the part of him in whom the confidence is reposed. If a conveyance was executed in his favor the burden rests upon him of proving that it was not procured by means of such confidence and influence. It is his duty before accepting it to see that the Grantor has disinterested advice. *McClure* v. *Lewis*, 72 Mo. 314; *Revett* v. *Harvey*, 1 Sim. & St. 502; *Allore* v. *Jewell,* 94 U. S. 506, 24 L. E. 260. This rule is not limited to those well reorganized cases of confidence such as guardian and ward, attorney and client, &c., but the rule extends to all cases where the relation of confidence exists. *Huguenin* v. *Basley*, 14 Vesey 273; *Dent* v. *Bennett*, 4 My. & Cr. 269; *McCormick* v. *Malin*, 5 Black (Ind.) 509; *Taylor* v. *Taylor*, 8 How. 83; *Dingman* v. *Romine*, 141 Mo. 475; *Moore* v. *Moore*, 56 Cal. 89; *Hall* v. *Knappenberger*, 97 Mo. 571; *Tracy* v. *Locket*, 1 Oh. St. 58; *Whitehorn* v. *Hines*, 1 Munf. 557; *Wilson* v. *Oldham,* 12 B. Mon. (Ky.) 55; Pomeroy Eq. Jur. (3rd ed.) Vol. 2, par. 947 and cases in note 3 Where persons from mental weakness are likely to be influenced by others, transactions entered into by such persons without independent advice will be set aside if there is any unfairness in them. *Harris* v. *Walmsey*, 41 Iowa 671; *Allore* v. *Jewell, supra;* *Kilgore* v. *Cross*, 1 Fed. 578; *Williams* v. *Williams*, 63 Md. 371. In *Ridgeway* v. *Herbert,* (Mo.) 73 Am. St. Rep. 464, where an infant was dissipated and a spendthrift, and the purchaser a much older man, the court said, ''that the plaintiff knew before hand how the money would be dissipated and that the law would not justify that sort of dealing and deeds so obtained will be set aside.'' The same rule is recognized in *Schuttler* v. *Brandfass*, 41 W. Va. 207, though applied to a different state of facts.

WILLIAMS, JUDGE:

Defendant William Davis has appealed from two decrees of the circuit court of Marshall county, pronounced on the

20th of June, 1916, and the 28th of February, 1917, respectively, avoiding a conveyance to him of a tract of land by William G. Bole, made the 9th of October, 1913, the day Bole became twenty-one years of age. He was an only child and heir at law of his mother, from whom he inherited the land. His mother died about the year 1902, and his father about the year 1909. James D. Burley was appointed his guardian in 1902, and continued as such until he reached his majority, and the boy resided with his father until the latter's death. By means of a friendly suit the guardian sold the coal under the land, described by metes and bounds and as containing 69 acres and 125 poles. The fund derived therefrom, amounting to $662.92, went into the guardian's hands. The expectation of coming into possession of this fund, when he should become of age, enabled the boy to obtain credit from a number of people, on his promise that he would then pay them. There was an oil and gas lease on the land, and the rentals in lieu of drilling amounted to $120.00 per year. In his final settlement, apparently not yet approved by the court, the guardian charges himself with $390.00 derived from this source, thus showing a sum in his hands to the credit of his ward, at the time he became of age, of $671.25. On the 17th of January, 1914, on the order of his ward, the guardian turned over to C. A. Showacre, his attorney, the balance of this fund, after crediting himself with certain disbursements on his ward's account. The sum turned over to his ward's attorney is $286.79. These facts are significant in considering the weight of evidence concerning Bole's alleged imbecility and incapacity, and whether the charge, that Davis exerted an undue influence over him and fradulently induced him to convey his land to him, is sustained.

In the spring of 1913 Bole married a woman much older than himself, by the name of Stella Patterson, and began housekeeping with her on his little farm. Soon thereafter he separated from her, charging her with adultery; and, being well acquainted with defendant Davis, he disclosed to him his domestic troubles. Thereupon Davis advised him he had good grounds for a divorce from his wife. Bole

then consulted an attorney who advised him that, as he
had continued to cohabitate with his wife after he knew
of her guilty conduct, he thereby condoned the offense, and
could not obtain a divorce.   This happened before he was of
age.   On the 21st of July, 1914, about nine months after
he became of age, Charles E. Carrigan was appointed a com-
mittee for him on motion therefor made by his wife Stella,
to whom apparently he had shortly before become reconciled,
and this suit was instituted by his committee on the 24th of
the following August.   The presumption of law is that, at the
time Bole made the deed, he was sane, and his committee
has the burden of proving otherwise.   *Buckey* v. *Buckey,* 38
W. Va. 168; *Delaplain* v. *Grubb,* 44 W. Va. 612; and *Eakin*
v. *Hawkins,* 52 W. Va. 124.   Bole understood and appreciated
the nature, character and effect of the transaction, and that
shows he had sufficient mental capacity to satisfy the rule of
law.   ''Eccentricity of manner and mental weakness of the
grantor which does not amount to imbecility are not sufficient
to overthrow a deed in the absence of proof of fraud in its
procurement.''   *Black* v. *Post,* 67 W. Va. 253.

Plaintiff prays that the deed be canceled on two grounds:
First, that his ward was *non compos mentis* and incapable
of understanding such a transaction; and, second, that de-
fendant exerted an undue influence over his ward, and in-
duced him to make the deed by fraudulent and improper
means.   The depositions in the case make a voluminous
record, over seven hundred pages.   It is an unnecessary task
which can serve no useful purpose to review in this opinion
the conflicting testimony.   Many witnesses have testified
respecting Bole's mental capacity, and their opinions are
diametrically opposed to one another.   Two or three physici-
ans and very many lay witnesses for the plaintiff swear,
in their opinions, that he was not mentally capable of trans-
acting business.   But the doctors who so testified made no
particular examination of him, and only a few plaintiff's
other witnesses had had personal transactions or dealings with
him, and their opinions were based on general impressions
received from conversations with the boy and from neighbor-
hood rumors.   On the other hand, many witnesses for de-

fendant testified that he was as capable of understanding and appreciating the nature of a transaction as anyone else. Dr. C. A. Wingerter, the only expert witness, a specialist in mental and nervous diseases with an experience of eight years or more, saw Bole on three occasions, and on two of them made a careful examination of him with a view of ascertaining whether he had any mental disease or was in any way abnormal. He examined him for two hours on each occasion, and his opinion is that he had the capacity to understand the nature, character and effect of business transactions, and that he was normal. The late distinguished judge below, whose written opinion in the case is copied in brief of counsel for appellee, held that mental incompetency was not shown. On the contrary, he says: "That brought to face a transaction he understands the act and what it means. He is not destitute of intelligence but he is without judgment." However, the court annulled the deed on the ground that Davis had induced Bole to make it by fraudulent means and undue influences exerted over him. But we hardly think this conclusion is justified by the weight of the evidence. Before he became of age, Bole induced many persons to extend him credit on his promise of paying them out of the funds in the hands of his guardian, when he became of age. He thereby deceived almost everyone who is shown to have had any dealings with him. He made many such promises and kept none of them. Such conduct may indicate moral obliquity, but it certainly does not tend to prove mental incapacity. Concerning his dealings with Davis, he and Davis are the most important witnesses, and as to the important transactions, the only witnesses. Bole first applied to Davis for money sometime in March, 1913, telling him he was in need of clothing. Davis then let him have about ten dollars, and continued to advance sums of money to him after that time, varying in amounts, until sometime in the month of October, 1913, on the faith of Bole's promise to pay him out of the fund in his guardian's hands, when he became of age. Davis kept an itemized account of the money advanced to Bole, and, when evidenced

by check, produces the checks endorsed by Bole, and when paid in cash, produces Bole's receipts therefor. Bole swears he kept no account and admits giving receipts to Davis, and, when they were shown to him, admitted the genuineness of his signature thereto, but denied recollection of many of the particular transactions. The court referred the cause to a commissioner to state an account of the sums of money advanced by Davis to Bole before he reached the age of twenty-one, the amount advanced after that time, and how much advanced during either period was for necessaries. Thr commissioner reported that Davis had advanced him $323.00 before he became twenty-one, to which he added $13.23 for a suit of clothes, as of October 6, 1913, and from the total deducted $60.00 which he found Davis had collected on oil and gas rental checks which should have been turned over to Bole, thus leaving a balance of $276.23 as the amount advanced in the first period, and reported $295.00 advanced in the second period, from which he found there should be deducted $106.79, the amount Showacre's check for the balance of the personal fund turned over to said Showacre as Bole's attorney, by J. D. Burley his guardian, and collected by Davis, thus leaving $188.21 as the amount actually advanced. Of the entire advancements he reported on $79.23 was for necessaries, $14.23 before he became of age and $65.00 afterwards.

If Bole was *compos mentis,* and we think the court below was right in concluding that he was, it is immaterial whether the money advanced was for necessaries or not, or whether it was advanced before or after he became of age. Because, after coming of age, he could validate his contracts made during infancy, and his acknowledgment of the money received during infancy constituted a valuable consideration for the conveyance, in the absence of fraud. An infant's contracts are not void, but voidable at his election. *Hobbs* v. *Hinton Foundry Co.,* 74 W. Va. 443, and *Blake* v. *Hollandsworth,* 71 W. Va. 387.

Bole tries to make it appear that Davis continually advanced him money to enable him to have a good time in order that he might thereby subject him to his wily influence

and procure his land for nothing or for a very small con-
sideration.   He swears Davis encouraged him to spend his
money in having what he called a "good time" with disso-
lute women.   Davis denies this, and is supported in his
denial by Bole's own letters written to Davis when Bole
was in Canton, Ohio, pretending he was at work earning
money.   Davis does not claim to have paid all the considera-
tion for the land before the time the deed was made, much
of the money was paid afterward.   Bole is convicted of lying
by his own testimony and is unworthy of belief.   In fact
he admits he lied to his attorneys when he was indicted for
arson.   He was in Canton, Ohio, in the spring of 1914, and
wrote to Davis a number of times for money.   After Davis
had sent him $25.00 on two occasions, he wrote for more
money and tried to make Davis believe he was saving his
money, by writing that he had deposited the $50.00 in bank
at 4% interest, that he was then employed on a job but
would not get his pay for four weeks, that he needed some
money to pay his board and could not draw his money out of
bank as it was deposited on time.   This and other letters
of similar character contradict the charge that Davis was en-
couraging him to spend his money in riotous living.   Davis
swears he had no idea of buying his land until after he
had advanced him money, but that he expected the boy
would repay him out of the fund he claimed he would re-
ceive from his guardian when he became of age, and did
not learn, until near the time he became of age, that all
his funds had been dissipated.   Bole's guardian turned over
only $286.79 to his attorney Showacre, and the bulk of
that was paid out by the latter in satisfaction of attorney fees
for defending Bole on the indictment for arson.   The house
he was charged with burning was located on his own land
and was filled with hay, a part of which belonged to a ten-
ant who had farmed or lived on his place and whom he
disliked.   When the indictment was pending he claimed he
burned it accidentally by dropping a lighted cigarette in
some combustible material.   Upon investigating the evidence
to sustain the charge, the prosecuting attorney was of the
opinion that it was not sufficient to warrant a conviction,

and nollied the case. In his testimony in this case Bole now admits he burned the building purposely, because he was mad at his tenant. How is such a witness to be believed where it is to his interest to swear falsely? Davis swears that Bole first approached him with an offer to sell him his land, about the time he became of age, and after Davis had learned that the fund in his guardian's hands had been nearly consumed and there was no chance of being repaid from that source, and that he bought the land as the only means of protecting himself. It is a rough, steep place, badly grown up in bushes, the fences in bad condition, with no buildings of any value on it, with the coal underlying it and mining privileges sold, and contains about 80 acres, only a small per centum of which is tillable. The nearest producing oil or gas well is one and a half or two miles distant. How long the lessee would continue to pay rental on the oil and gas lease was problematical, and whether the property contains oil or gas no one knows. The consideration recited in the deed is $900.00, and Davis swears Bole fixed the price himself, and is corroborated by Bole's own statement made to Dr. Wingerter, who says that, in one of his conversations with Bole, he told him he went to Davis and offered to sell him the place, that the reason he gave for doing so was, that Davis had at previous times befriended him, that he had determined to sell the farm, and while he might have gotten a little more for it from someone else, still out of gratitude to Davis he wanted to give him any advantage that might accrue from the purchase. For sometime before he sold his place and for several months thereafter Bole lived separate and apart from his wife, who did not join in the deed. Sometime before his committee was appointed he apparently became reconciled to her, because the appointment was made on her motion, and he was present and did not resist the motion. In fact, he now says he thought he needed a committee. Davis swears, and this statement is not denied, that Bole and his wife first brought a suit against him, before the committee was appointed, that he was served with a summons in such suit. Apparently that suit was discontinued or abandoned, and a

committee thereafter appointed and the present suit brought in its stead.

It is not explained why his wife was not examined as a witness, but it appears from the testimony of J. E. Palmer, who knew Bole well, that in a conversation with him about selling his farm, witness told him when he got his money it wouldn't last long, that he wouldn't work, and asked him, when he ran out of money, what he was going to do, and Bole replied, that he would get Stell, (meaning his wife), "to get the place back again and sell it again." In fairness to Bole's committee, it is proper to say he knew nothing about his ward's disposition and habits, and only consented to act as his committee at the request of the attorneys who appeared for his wife. Bole is shown by the record to be a lazy, spendthrift, wholly untrustworthy and unreliable. He appears to be a moral degenerate, but he is certainly not proven to be an imbecile or lacking in mentality. Considering the time he went to school he seems to have made fair progress; he says he studied geography, history and reading in the fifth reader, and says he had taken up literature. His spelling is bad and he fails to observe the rules of punctuation, but he writes and expresses himself fairly well. Some of the witnesses in describing his mental condition say it is a case of arrested development, that he is like a child. That his mind lacks proper education and training cannot be doubted, but he has a great amount of cunning, and has deceived many persons into lending him money and credit. Having determined that Bole was not an imbecile, or a lunatic, but that he was capable of appreciating the effect of what he did, we hardly see how the learned judge could reach the conclusion that he was duped and imposed on by Davis, and was unduly influenced to convey his land to him. Bole was shrewd enough to try to make it appear, by his own testimony, that he was under the influence and domination of Davis. He swears Davis would give him money, beer and whiskey and would encourage him to associate with lewd women, and, as he says, "have a good time." Davis denies this, and he is supported in his denial by Bole's letters to him. In those letters, importuning

Davis for more money, he tried to create the impression on the latter's mind that he was working and saving his money. But it appears that, when he got employment, he never held the job longer than a few days at most. He tells a very romantic story of his engagement to marry a girl in Canton, Ohio, while he was living apart from his wife, which illustrates his power to deceive others. According to this story he had bought a lot from the girl's brother who was a real estate agent, paid $25.00 on it and had actually arranged to build a bungalow, when the girl happened to discover that he was a married man, and, he says, he then lost little time in getting away in order to escape the anger of her brother. He is a self-convicted liar, and how the court could accept his version of the transaction with Davis we cannot understand. If his testimony is rejected, as we think it must be, there is no evidence to support the charges of fraud and undue influence. These charges are explicitly denied by the answer.

That the deed was executed on the very day Bole became of age, casts no suspicion on the good faith of Davis, in view of the circumstances. Bole owed other people who were anxious to secure their money, and he knew that, if they sued him, his land would be sold and his basis of credit for the future would be gone, whereas if he repaid Davis in full the money advanced during his minority, he would receive more from him in the future, until the whole consideration for the land was paid. Davis did not finish paying the purchase price until sometime in the spring of 1914.

There is much conflict in the evidence respecting the actual value of the land. Some of the witnesses value it as high as $2,000.00 or $2,500.00. Their opinions, however, are based upon the assumption that there are twenty acres of coal yet unsold. This assumption appears to be erroneous. Other witnesses value it at $800.00 to $1,000.00, and some of them as high as $1,200. Considering the location, rough and steep character and grown up condition of the land, the facts that there are no buildings of any value on it, that the fences are nearly gone, that the oil and gas lease is liable to be surrend-

ered at any time and, therefore, the rentals of uncertain duration, and that the land is encumbered with the contingent dower right of Bole's wife, it cannot be said that $900.00 is such an inadequate price as to raise the presumption of fraud or undue influence. Witnesses well acquainted with the particular land, who appear to be good judges of land values, do not estimate it above $1,200.00, and most of them not over $1,000.00

Davis swears that, on the 6th of March, 1914, he paid Bole $75.00, the balance of the $900.00, and took from him a receipt in full, and produced the receipt. Although Bole's recollection appears to be certain and clear as to most things, he professes not to recollect that transaction; he simply says: "No sir, I forget all about that day, I don't remember any conversation on that day at all,—it is a blank." But he does not deny his signature to the receipt, and when asked if it was, replied, "it might be."

Notwithstanding the burden of proof must be borne by the plaintiff, the decided preponderance of the evidence is in favor of the defendant, which calls for a reversal of the two decrees of June 20, 1916, and February 28, 1917, respectively, and the dismissal of plaintiff's bill, and it will be so ordered.

## ON REHEARING

After listening to exhaustive oral arguments by counsel for the respective parties and reading their briefs, and again carefully considering the evidence taken to sustain the contentions that plaintiff's ward was incapable of transacting business and was unduly influenced and defrauded of his property by the defendant, the court is satisfied that these charges are not borne out by the record. That Bole was not an imbecile or *non compos mentis,* but was able to deceive a number of other persons besides Davis and thereby secure credit, is abundantly proven. He was not so mentally defective as not to be able to transact business for himself. That he was morally crooked and irresponsible, and had little regard for the truth, when a falsehood would serve

his purpose better, clearly appears.   He was a spendthrift and was able, while yet an infant, to deceive many persons and obtain credit upon his promises, that when he arrived at age and received his money from his guardian he would pay them.

The contention of plaintiff's counsel that Davis deliberately set about to gain Bole's confidence by advancing him small sums of money and then to defraud him out of his land is not proven.   Bole testified in his own behalf, and the intelligence revealed by his answers to questions shows that he had legal capacity.   That his business judgment was not good may be true, but many persons, who could not even be suspected of want of legal capacity, are liable to the same criticism.

Davis swears he kept an accurate account of the money advanced to Bole and presented an itemized account of the same, showing that he has paid him $1,085.00, $185.00 more than the price of the land.   On the other hand, Bole admits he kept no account, does not know how much money he received and denies some of Davis' charges.   But every one of them is proven either by Davis' checks to Bole, endorsed by the latter, or by receipts signed by Bole.   In addition to the many receipts for small amounts, given at the time the money was advanced, Bole signed a receipt for $900.00, on March 6, 1914, stating that it was in full of the price for the land.

Davis presents a receipt for $150.00, advanced to Bole in May, 1913, which he says was money he let Bole have to buy stock for his farm at the time Bole married and went to housekeeping.   Counsel for plaintiff contend that Bole's signature to that receipt is a forgery, and had the original record brought up in order to satisfy this court that their contention was right.   We have carefully examined this receipt and Bole's signature thereto, compared it with his signature endorsed on checks payable to him, the genuineness of which is admitted, and are satisfied that his signature to the receipt in question is his genuine signature.

That defendant may not have kept his account in chronological order in his book of original entry is of little signi-

ficance in view of the receipts produced by him, signed by
Bole, proving payments amounting to the full purchase
price of the farm. We are, therefore, satisfied that no mis-
take was committed on the original hearing and adopt the
written opinion then prepared.

*Reversed, and bill dismissed.*

---

# CHARLESTON.

Submitted September 9, 1919.  Decided September 16, 1919.