## T. R. Cyrus

*v.*

## J. C. M. Tharp, *et al.*

(No. 12145)

Submitted May 1, 1962.  Decided June 19, 1962.

*Ferguson, Baer & Ferguson, Charles W. Ferguson, III,* for appellants.

*Chad W. Ketchum, Tom T. Baker,* for appellee.

CALHOUN, PRESIDENT:

On June 28, 1958, Olive M. Adkins, a widow, executed a deed dated June 24, 1958, conveying a house and lot in Huntington, West Virginia, to J. C. M. Tharp and Pearl Tharp, husband and wife. The grantor in the deed died intestate on July 1, 1958, the fourth day after the day on which

the deed was executed. T. R. Cyrus, her brother and sole heir at law, who is referred to herein as the plaintiff, instituted a suit in chancery in the Circuit Court of Cabell County against J. C. M. Tharp and Pearl Tharp, who are referred to herein as defendants or as the Tharps, seeking to set aside such deed and to have it declared null and void on the ground that the grantor lacked the requisite mental capacity at the time the deed was executed and on the ground of fraud and undue influence alleged to have been practiced upon her by the grantees.

The testimony was taken orally at the bar of the court on February 25, 1959. At the conclusion of the testimony, the court took the case under advisement and it was accordingly continued. On February 17, 1961, the court entered a final decree, setting aside the deed in accordance with the prayer of the bill of complaint.

This appeal, granted at the instance of the defendants by this Court on November 27, 1961, involves primarily the question whether the judgment of the trial court is sustained by the evidence when measured by applicable legal principles. A determination of that question requires a review of pertinent proof bearing on the question of the mental capacity of Olive M. Adkins at the time she executed the deed in question. Evidence of fraud and undue influence is so meager as to lack significance when considered apart from the precise question of mental capacity.

Both T. R. Cyrus, the plaintiff, and J. C. M. Tharp, defendant, testified extensively both on direct examination and on cross-examination. No question has been raised on this appeal concerning their competency to testify.

Olive M. Adkins was more than eighty years of age, and perhaps eighty-five, when the deed in question was executed. For many years she kept roomers and boarders for compensation at the home which she conveyed to the defendants. About two years prior to her death, her son died, and thereupon her brother, the plaintiff, moved to her home and continued to live there until her death. The evidence fails to disclose affirmatively a very close relationship be-

tween the sister and brother meantime. He was seventy-five years of age at the time of the trial. After the death of her son, Mrs. Adkins continued to keep roomers but discontinued keeping boarders.

In June, 1958, Mrs. Adkins developed a severe infection following the extraction of two teeth. A doctor visited her and treated her at her home for about a week and thereafter had her entered as a patient in the Cabell-Huntington Hospital on June 24, 1958. As stated earlier herein, her death occurred on July 1, 1958.

Apparently the defendants became acquainted with each other and were married at Mrs. Adkins' home. There can be no question from the evidence of the fact that a close and cordial relationship existed between Mrs. Adkins on one hand and the Tharps on the other over a considerable period of years, extending down to the date of her final illness and death.

The close and cordial relationship between Mrs. Adkins and the Tharps, particularly Mr. Tharp, who is referred to by witnesses as "Monty," was manifested in many ways. This appears from various witnesses on both sides of the case. Lawrence Pauley, an attorney of Huntington since 1958, at one time lived in the home of Mrs. Adkins for two years while gainfully employed and while attending Marshall University. From his testimony it is apparent that he also developed a very cordial relationship with Mrs. Adkins which continued until her final illness. He testified that the Tharps visited Mrs. Adkins quite frequently; that she called upon Mr. Tharp from time to time to take her to her doctor and that he paid the doctor bills; that his employees from his place of business painted her house "from top to bottom" and repaired the front porch; that he "took care of" the funeral arrangements for her son; that Mr. Tharp was her best friend; that she was "always referring to Monty. Monty this and Monty that"; that Mrs. Adkins had stated to the witness that her brother, the plaintiff, merely went into and out of his room and was "not a bit of comfort in the world to me"; that she stated also that her brother paid no bills except utility bills and did not bring home anything

from his store; that the Tharps from time to time took her to their home and to their cottage on the river; that both he and Mrs. Adkins were once at the Tharp home for Christmas; and that Mrs. Adkins "told me on many occasions that Monty had been keeping her for years."

Dove Rader, a former wife of the plaintiff, testified that she stayed at the home of Mrs. Adkins during her final illness immediately before she entered the hospital; and that on that occasion Mrs. Rader called Monty and he procured a doctor to treat Mrs. Adkins. The plaintiff himself testified that Mr. Tharp paid $100 to have Mrs. Adkins entered as a patient in the hospital. He did not know who paid the additional hospital and doctor bills, but he testified that in any event he did not receive any such bills. He testified that it was Mr. Tharp who first notified him that his sister had entered the hospital. The plaintiff was away from his sister's home and in another part of the city at the time. Apparently Mr. Tharp notified the plaintiff of his sister's death.

Testimony of various witnesses on both sides discloses clearly that the Tharps desired and urged Mrs. Adkins from time to time to come to live with them in their home, but she preferred to continue to live in her own home, the one involved in this suit. Phyllis Dean, a housewife and an intimate friend of Mrs. Adkins for about twenty-five years, testified that Mrs. Adkins regarded Monty as a son. She said he bought medicine for her and took her to various places. This witness testified further that, on two different occasions, Mrs. Adkins, referring to Monty and work he had done about her home, stated: "Well, he can do what he wants, because it is his house." Carmen Abele, a close friend of Mrs. Adkins for thirty years, testified that Mrs. Adkins considered Monty as a son because he had done so much for her, and she "always" said she wanted the Tharps to have her home, because "they had been closer to her than anyone else."

In brief, the testimony is overwhelming to the effect that a cordial relationship and one of mutual affection existed between Mrs. Adkins and the Tharps. Evidence to the con-

trary is quite meager. We do not, of course, mean to imply that a proper decision of this case depends on the existence or nonexistence of such cordial relationship, but such relationship has a pertinent bearing on the question of the reason or inducement for the making of the deed.

The deed in question recites that it was made "in consideration of the sum of Ten ($10.00) Dollars, cash in hand paid, and other good and valuable considerations." At the time Mr. Tharp arranged with an attorney to prepare the deed, he instructed the attorney to prepare also a written contract for the protection of Mrs. Adkins. The deed and contract bear the same date and both were dictated by the attorney at the same time, in the sense that one was dictated immediately following the dictation of the other. After reciting the making of the deed and the desire of the Tharps to "continue looking after her for the rest of her natural life", the contract contains the following language:

> "That for and in consideration of the conveyance to the parties of the first part of certain property by the party of the second part, hereinabove described, the said parties of the first part do hereby agree that they will provide a home for the party of the second part for the rest of her natural life, and further the said parties of the first part will provide food, clothing, shelter and necessary medical and hospital care if needed for the said party of the second part.

> "It is further agreed by and between the parties hereto that the said parties of the first part will permit the party of the second part to have, for her own use and benefit, all rents received from the property hereinabove referred to, except for those necessary to maintain the house in a normal state of repair."

The contract did not include the customary language used for the acknowledgment of a writing, though it was signed by both J. C. M. Tharp and Pearl Tharp. The attorney who prepared the deed testified that he omitted provision for an acknowledgment because he considered such an acknowledgment unnecessary. Mr. Tharp testified that he and his wife signed the contract at their home and that he took it

to the hospital for delivery to Mrs. Adkins at the time she executed the deed; but that he was instructed by her to "take it [the contract] home and put it in her room."

J. C. M. Tharp, defendant, testified: "I would say over a period of time, starting from the time her son died, at least I would be safe in saying 25 times she wanted me to get a deed made and have her sign it." He testified further that "Mrs. Rader was just as insistent that them papers would be signed as Mrs. Adkins herself."

Various witnesses testified in behalf of the plaintiff concerning the mental capacity of Mrs. Adkins, though much of this testimony does not relate to the occasion, or even the day on which the deed was executed. The plaintiff himself testified that, on his visits to the hospital, his sister recognized him "for a while but in the last she didn't know me at all." Roy Capehart, chief accountant for the hospital and the notary public who took the acknowledgment to the deed, testified that conversation was had with Mrs. Adkins on that occasion but he could not recall the nature thereof; that he believed she "understood what she was doing"; that she recognized Mr. Tharp and "acknowledged his presence"; that she "immediately roused up and then sat up in the bed"; that Mr. Tharp did not employ any sort of "force" in an effort to induce her to sign the deed; and that "she sat up by herself" and signed the deed on a hospital table placed over her bed. Dove Rader, the former wife of the plaintiff who spent much time attending Mrs. Adkins at her home before she entered the hospital, testified that she and the plaintiff went to the hospital each day to visit his sister. She testified relative to conversations had with Mrs. Adkins at the hospital from time to time; that Mrs. Adkins did not recognize her "the last two days"; that she thought these two days were Saturday and Sunday, but that she "could be mistaken;" that Mrs. Adkins was "practically in a coma the whole time she was in" the hospital; but that on Saturday "she might have just turned over and spoke or something like that." Marguerite Jeffries testified that she visited Mrs. Adkins at the hospital the day before she died and that she "didn't know me at all." Tom Zumbrunnen, as-

sociate pastor of Mrs. Adkins' church, testified that he was not acquainted with her, but that he visited her at the hospital on Sunday, the day following the execution of the deed; that he was in her room "a few minutes"; that he spoke to Mrs. Adkins and she did not respond; and that he promptly left the room. Mrs. Virginia Carte visited Mrs. Adkins at the hospital about seven o'clock on Saturday evening. She testified that she tried to converse with Mrs. Adkins, but that she "was unconscious, seemingly in a stupor." Grace Barr, a close friend of Mrs. Adkins, visited Mrs. Adkins while she was ill at her home, but did not visit her in the hospital. She testified that she learned about Mrs. Adkins' condition while in the hospital, once by a telephone call to Mrs. Tharp and once by a telephone call from Mrs. Tharp. Mrs. Mabel Edmunds last saw Mrs. Adkins about two weeks prior to her death. Mrs. Etta Helene Brown testified that she visited Mrs. Adkins on two occasions at the hospital—the day after she was admitted and the day before she died; and that Mrs. Adkins on such occasions "was critically ill"; that on the latter of such two visits "she knew who I was", and "she recognized my voice"; that on the former of such visits Mrs. Adkins tried to talk but did not complete her sentences so as to make her meaning intelligible to the witness, but that, nevertheless, she knew the witness and called her by name.

The foregoing represents a summary of all the testimony offered in behalf of the plaintiff. Portions thereof which bear on the question of the mental capacity of the grantor at or near the time of the execution of the deed are somewhat inconclusive, uncertain and unsatisfactory.

Among witnesses who testified in behalf of the defendants, we have referred previously herein to the testimony of Attorney Lawrence Pauley. We have referred also to the testimony of J. C. M. Tharp, defendant, including his opinion that Mrs. Adkins was mentally competent when she executed the deed.

Mrs. Phyllis Dean, a witness for the defendants, testified that she visited Mrs. Adkins for about twenty minutes at the hospital between one and two o'clock in the afternoon

of the Saturday on which the deed was executed. She testified that at that time the hospital bed was raised so that Mrs. Adkins "was propped up in bed". She gave the following additional testimony: "Her mental capacity when I saw her Saturday in the hospital was the same as when she was well. I feel she was in complete control of her faculties."

Mrs. Mavis Casto testified that her mother was a patient in the same room with Mrs. Adkins; and that during all the time Mrs. Adkins was in the hospital, except the day she died, the witness visited her mother once or twice each day. When asked as to Mrs. Adkins' mental capacity on Friday, Saturday, Sunday and Monday immediately preceding her death, Mrs. Casto testified: "She seemed perfectly sane to me, as far as I could see. She was just as normal as you and I would be."

Mrs. Carmen Abele, a close friend of Mrs. Adkins for more than thirty years, visited her in the hospital for about an hour during Sunday afternoon, the day following the execution of the deed. The witness testified that on such occasion she conversed with Mrs. Adkins, and that she "was perfectly rational as always." She testified that Mrs. Adkins' mental faculties on the day in question were normal in the sense that there "was no difference in her mind." When asked whether, in her opinion, Mrs. Adkins was "capable of knowing the effect of executing a deed", the witness replied: "Yes. She could understand that perfectly."

Mrs. Garnet Nickel, a resident of Huntington, was a patient in the hospital when Mrs. Adkins was entered as a patient in the same room. The two continued to occupy the same room until Mrs. Nickel left the hospital on Monday, the day preceding Mrs. Adkins' death. At the time of the taking of testimony in the circuit court, she was in Florida. Under such circumstances a written statement of facts signed by her was admitted, by stipulation of counsel, as a part of the proof in the case. A portion of the written statement is as follows:

"* * * During the time she was there she had numerous visitors, however, Mr. and Mrs. Tharp seemed to come most often and appeared to have

the most to do with taking care of Mrs. Adkins. Each time Mr. Tharp came in I would hear Mrs. Adkins ask him if he had brought the deed for her to sign to the 9th Street property. The first few times she asked this, Mr. Tharp would tell her to wait until she was well and out of the hospital and that they would fix up the deed later. However, Mrs. Adkins *deep* insisting to him that she wanted him to bring the deed in so she could deed the 9th Street property to Mr. and Mrs. Tharp. On Friday, the day before the deed was finally signed, Mrs. Adkins talked with me at length while we were *along* in the room, telling me about her property on 9th Street and that she wanted to deed it to Mr. and Mrs. Tharp. The next day, on Saturday, Mr. Tharp came in with the deed and had a Notary Public come into the room. Mrs. Adkins said, 'give me the deed and hand me my glasses.' I remarked to her, 'surely you are going to read that before you sign it.' Mrs. Adkins laughed, glanced over the deed and signed it.

"Mrs. Adkins had not had any medicine that day before signing the deed. Her mind was clear as it was all the time she was in the hospital, and she knew exactly what she was doing in signing the deed. During the time Mrs. Adkins and I were in the room, we talked frequently and during our conversations she indicated to me that she was very fond of Mr. and Mrs. Tharp."

Dr. Douglas Ey was the physician who was summoned by J. C. M. Tharp, defendant, to visit and administer to Mrs. Adkins at her home as stated previously herein. He visited and treated her at her home on two or more occasions before she entered the hospital. The doctor testified that during this period at her home she explained her symptoms to him and appeared to be rational, though it was difficult to understand her "because of her mouth—the left side of her face was paralyzed." Thereafter the doctor visited her once or twice each day in her room at the hospital.

Using the patient's hospital record to refresh and supplement his own recollection, Dr. Ey testified that Mrs. Adkins continued to show improvement from the time she entered the hospital on Tuesday, June 24, until Tuesday, July 1,

the day she died. The patient's hospital record disclosed that on Saturday, June 28, the day the deed was executed, her temperature had returned to normal, and that Dr. Marple, who was associated with Dr. Ey in treating the patient, made a notation on the record that day indicating that the patient's condition was such that she could be returned to her home for further treatment. The record discloses that on Sunday, June 29, the patient was "improving", and that on Monday, June 30, she was continuing to improve and eating well. Dr. Ey testified that Mrs. Adkins' death on Tuesday, July 1, resulted from "a stroke" or "a cerebral vascular accident."

Throughout his entire testimony, including testimony given in response to a searching cross-examination, Dr. Ey was firm in his opinion and assertion that except for "possibly the first 24 hours" after she entered the hospital, Mrs. Adkins was mentally competent, particularly during the period of June 26-30, inclusive. He was asked the following questions and gave the following answers:

"Q. I particularly direct your attention to the 28th. On the 28th was she, or would you say that she was mentally competent and in control of her mental *facilities*.

"A. Yes, sir.

\* \* \*

"Q. Doctor, in your opinion was she mentally competent to know what a deed was, and know what she was doing in executing a deed on the 28th?

"A. I don't know if she knew what a deed was, but I would say she was mentally competent, yes.

"Q. Was her mental condition such that if she wanted to give away something which she owned, or sell something which she owned, that she would have known what she was doing.

"A. Oh, yes, sir.

"Q. Would you have said that that same answer would apply to the 26th, 27th, 28th, 29th, and 30th?

"A. Yes, sir."

On the question of Mrs. Adkins' susceptibility to persuasion, the doctor testified: "I don't believe she would be

any more persuaded, easily persuaded in the hospital than she would be at home, had she not been sick."

The presumption of law is that the grantor in a deed was sane and competent to execute it at the time of its execution, and the burden of proving that he was not mentally competent is on the one attacking its validity. *Jordan* v. *Cousins,* 128 W. Va. 648, 651, 37 S. E. 2d 890, 892; *Ellison* v. *Lockard,* 127 W. Va. 611, pts. 1 and 3 syl., 34 S. E. 2d 326; *Wade* v. *Sayre,* 96 W. Va. 364, 123 S. E. 59; *Martin* v. *Moore,* 92 W. Va. 671, 115 S. E. 833; *Carrigan* v. *Davis,* 84 W. Va. 473, pts. 1 and 2 syl., 100 S. E. 91; *White* v. *Mooney,* 73 W. Va. 304, 80 S. E. 844; *Black* v. *Post,* 67 W. Va. 253, pt. 1 syl., 67 S. E. 1072; *Farnsworth* v. *Noffsinger,* 46 W. Va. 410, pt. 1 syl., 33 S. E. 246; *Delaplain* v. *Grubb,* 44 W. Va. 612, pt. 1 syl., 30 S. E. 201; *Buckey* v. *Buckey,* 38 W. Va. 168, pt. 1 syl., 18 S. E. 383; *Jarrett* v. *Jarrett,* 11 W. Va. 584, pt. 6 syl. The point of time to be considered in determining the grantor's mental capacity is the time of the execution and delivery of the deed. *Jordan* v. *Cousins,* 128 W. Va. 648, 650, 37 S. E. 2d 890, 892; *Wade* v. *Sayre,* 96 W. Va. 364, pt. 2 syl., 123 S. E. 59; *Woodville* v. *Woodville,* 63 W. Va. 286, pt. 4 syl., 60 S. E. 140; *McPeck* v. *Graham,* 56 W. Va. 200, pt. 3 syl., 49 S. E. 125; *Delaplain* v. *Grubb,* 44 W. Va. 612, pt. 4 syl., 30 S. E. 201; *Buckey* v. *Buckey,* 38 W. Va. 168, pt. 4 syl., 18 S. E. 383; *Jarrett* v. *Jarrett,* 11 W. Va. 584, pt. 3 syl. The condition of the grantor's mind, both before and after the execution of the deed, is proper to be considered in determining what was his mental condition at the time the deed was executed. *Jarrett* v. *Jarrett,* 11 W. Va. 584, pt. 4 syl. Mere old age or infirmity of mind and body is not sufficient to overcome the presumption of mental capacity of the grantor. *Ellison* v. *Lockard,* 127 W. Va. 611, pt. 2 syl., 34 S. E. 2d 326; *Burkle* v. *Abraham,* 112 W. Va. 257, pt. 2 syl., 164 S. E. 150; *Doak* v. *Smith,* 93 W. Va. 133, pt. 5 syl., 116 S. E. 691; *Barnett* v. *Greathouse,* 77 W. Va. 514, 522, 88 S. E. 1013, 1016; *Bade* v. *Feay,* 63 W. Va. 166, pt. 1 syl., 61 S. E. 348; *Teter* v. *Teter,* 59 W. Va. 449, pts. 2 and 4 syl., 53 S. E. 779. "If a person is capable of knowing the nature, character and effect of his deed at the time of making it, he is considered as legally *compos mentis.*" *Black* v. *Post,*

67 W. Va. 253, pt. 2 syl., 67 S. E. 1072. To the same effect see *White* v. *Mooney,* 73 W. Va. 304, 80 S. E. 844; *Leatherman* v. *Leatherman,* 82 W. Va. 748, 97 S. E. 294; *Carrigan* v. *Davis,* 84 W. Va. 473, pt. 1 syl., 100 S. E. 91; *Doak* v. *Smith,* 93 W. Va. 133, pt. 5 syl., 116 S. E. 691. "A confirmed insane person may, in a lucid interval, make a valid contract." *McPeck* v. *Graham,* 56 W. Va. 200, pt. 2 syl., 49 S. E. 125. See also *Towner* v. *Towner,* 65 W. Va. 476, 64 S. E. 732.

"The evidence of witnesses present at the execution of the deed is entitled to peculiar weight." *Jarrett* v. *Jarrett,* 11 W. Va. 584, pt. 7 syl. To the same effect see *Buckey* v. *Buckey,* 38 W. Va. 168, 175, 18 S. E. 383, 386. The testimony of a notary public or other official who took the acknowledgment is entitled to peculiar weight in determining the mental capacity of the grantor. *Burkle* v. *Abraham,* 112 W. Va. 257, pt. 1 syl., 164 S. E. 150; *Martin* v. *Moore,* 92 W. Va. 671, 677, 115 S. E. 833, 836; *Farnsworth* v. *Noffsinger,* 46 W. Va. 410, pt. 4 syl., 33 S. E. 246; *Delaplain* v. *Grubb,* 44 W. Va. 612, pt. 3 syl., 30 S. E. 201; *Buckey* v. *Buckey,* 38 W. Va. 168, pt. 3 syl., 18 S. E. 383. See also *Ellison* v. *Lockard,* 127 W. Va. 611, pt. 4 syl., 34 S. E. 2d 326. "The evidence of physicians, especially those who attended the grantor, and were with him considerably during the time it is charged he was of unsound mind, is entitled to great weight." *Jarrett* v. *Jarrett,* 11 W. Va. 584, pt. 8 syl. See also *Ward* v. *Brown,* 53 W. Va. 227, 256, 44 S. E. 488, 500.

The testimony offered in behalf of the plaintiff to rebut the presumption of sanity is indefinite, inconclusive and unconvincing. The portion thereof bearing on the mental condition of the grantor on the day the deed was executed is quite limited. On the other hand, witnesses in behalf of the defendants include Mrs. Garnet Nickel, J. C. M. Tharp, defendant, and Roy Capehart, the notary public, all of whom were actually present at the precise time the deed was executed. Mrs. Mavis Casto, who visited her mother and observed Mrs. Adkins daily, testified that Mrs. Adkins was "perfectly sane," "normal," and that she "wouldn't say she was sick as far as her mental condition was concerned." The testimony of Dr. Ey is quite persuasive because he was the attending physician; because he visited Mrs. Adkins once

or twice each day while she was in the hospital; because it was a part of his professional duty to study and observe her condition; and because of the positive, unwavering nature of his testimony bearing on the question of Mrs. Adkins' mental capacity. We are required by law to give peculiar weight to the testimony of the doctor, and also to the testimony of the notary public, who was under a duty not to lend his official assistance to the execution of a deed by one who lacked proper mental capacity to do so.

We believe that the findings of fact made by the trial chancellor are against the clear weight and preponderance of the evidence, and that such findings should be reversed. *Smith* v. *Smith,* 138 W. Va. 388, 404, 76 S. E. 2d 253, 263; *Tokas* v. *Arnold,* 122 W. Va. 613, pt. 3 syl., 11 S. E. 2d 759; *Wood* v. *Snodgrass,* 116 W. Va. 538, pt. 2 syl., 182 S. E. 286; *Central Trust Co.* v. *Cook,* 111 W. Va. 99, pt. 2 syl., 160 S. E. 561.

For reasons stated herein, the judgment of the Circuit Court of Cabell County is reversed and the case is remanded to that court with directions to enter judgment in favor of the defendants.

*Reversed and remanded with directions.*