# CHARLESTON

### BADE, ADMR., v. FEAY et al.

Submitted June 15, 1907.   Decided November 26, 1907.

1. BILLS AND NOTES—*Mental Incapacity—Presumption.*

    Mere infirmity of mind and body is insufficient to overcome the legal presumption of mental capacity in one who has executed a will, deed, contract or other instrument.   (p. 168.)

2. SAME—*Undue Influence.*

    When procurement of the execution of an instrument by the exercise of undue influence is charged, it is important to ascertain the degree of mental impairment, even though the evidence is insufficient to overcome the presumption of competency, since a weak and feeble mind is more easily overcome by undue means than a strong one.   (p. 169.)

3. SAME—*Burden of Proof.*

    One who assails a will, deed or contract as having been procured by undue influence, bears the burden of proving both mental weakness and undue influence, when both are relied upon.   (p. 177.)

4. SAME—*Presumption.*

    Relationship of aunt and nephew, mistress and servant, patient and nurse, do not all combined raise a legal presumption of undue influence. They are mere circumstances, which, together with other facts, may be sufficient to establish fraudulent procurement.   (pp. 178, 180.)

5. SAME—*Consideration.*

    A promissory note given to a near relative, by a person in declining years, by way of compensation or reward for services rendered and to be rendered, is so much in the nature of a testamentary disposition of property, that, ordinarily, the maker's estimate of the value of the services will not be disturbed on the ground of disparity between the actual value thereof and the amount of the note.   (p. 181.)

6. SAME.

    That such a note, so given, calls for a larger sum than the services were probably worth does not invalidate it on the ground of fraud or failure of consideration.   (pp. 181, 182.)

7. GIFT—*Promissory.*

    A promissory note cannot operate as a gift, for, as such, it would be unexecuted and incomplete, amounting only to a promise to give.   (p. 167.)

Appeal from Circuit Court, Ohio County.

Bill by Fred C. Bade, administrator, against Moses Feay and others. Decree for plaintiff, and defendant Benoni Feay appeals.

*Reversed. Remanded.*

JOHN J. CONIFF, for appellant.

CALDWELL & CALDWELL, for appellees, heirs of Rachel Thornburg.

POFFENBARGER, JUDGE:

In a chancery suit, instituted in the circuit court of Ohio county, by Fred C. Bade, administrator of the estate of Rachel Feay Thornburg, deceased, against the heirs at law of his decedent, for the settlement of her estate, one Benoni Feay, a nephew of plaintiff's intestate, by his answer to the bill, set up a demand against her estate, for the sum of $6,000.00, evidenced by her promissory note, dated May 29, 1901, and payable one year after the date thereof. The commissioner to whom the cause was referred for ascertainment of the property and debts of the decedent disallowed the claim, and the court having confirmed the report, after overruling Feay's exception thereto, and decreed a sale of the real estate, he has appealed from the decree.

As there is some evidence tending to show that the note was presented to Feay as a gift, though he claims it was executed in consideration of services rendered, and endeavors to sustain it on that ground and no other, it may tend to clearness of perception of the issue to observe, at the outset, that the note cannot have effect as a mere gift, it being nothing more than a promise to give money, signifying intention to give, but not amounting to, or evidencing, execution of such intent. It could amount to nothing more than what is called an unperfected gift, which cannot be enforced for the reason that a gift, until completed, is always revocable. This principle is abundantly established by the authorities. *Seabright* v. *Seabright*, 28 W. Va. 412, 479; *Dillon* v. *Cotton*, 4 Myl. & C. 647; *Cotteen* v. *Missing*, 1 Madd. 176; *Searle* v. *Law*, 15 Sim. 95; *Ward* v. *Audland*, 8 Beav. 201; *Weale* v. *Ollive*, 17 Beav. 252; *Cal-*

*lihan* v. *Callihan*, 8 Cl. & F. 374. The law of this subject is thoroughly expounded in *Cotteen* v. *Missing*, where it is said: "In general, to entitle a person to a gift, it must be perfected and complete, or a court of equity will not interfere to compel a specific performance. If it rest *in fieri*, and is incomplete, equity will not interfere. In *Tait* v. *Hibbert*, (2 Ves. jun. 111), a cheque given as a bounty to a party, payable to bearer, and also a promissory note, were held not to be sufficient gift, sustainable in equity, the donor dying before they were paid. In *Antrobus* v. *Smith* (12 Ves. 39,) the Master of the Rolls says (Ibid. p. 46): "He meant a gift. He says he assigns the property. But it was a gift not complete. The property was not transferred by the act. Could he himself have been compelled to give effect to the gift by making an assignment? There is no case in which a party has been compelled to perfect a gift, which in the mode of making it he has left imperfect. There is *locus poenitentiae* as long as it is incomplete. How is it at law? In *Taylor* v. *Lendey* (9 East. 49,) a sum of money voluntarily paid into the hands of A. for the benefit of a third person was held to be a countermandable gift so long as it remained in A.'s hands." All gifts, to be effective, must be complete, fully executed. *Seabright* v. *Seabright*, 28 W. Va. 412, 479.

Whether it can be sustained as a contract, founded on a valuable consideration, involves inquiries as to the existence of consideration and its sufficiency, the mental competency of Mrs. Thornburg to make a contract and the procurement of the note by the exercise of undue influence over her, she having been an aged lady and not in the enjoyment of good health or her original mental vigor and strength.

The evidence wholly fails to establish mental incompetency. Mrs. Thornburg was a lady about 83 years old at the time of her death, October 7, 1901, and had been in bad health for some time, which facts account, in part, for the impairment of mental power, disclosed by incidents and circumstances detailed in the testimony of the witnesses. In the fall of 1900, she had a severe spell of sickness from which she had partially or wholly recovered in the early spring of 1901, but, in April of that year, she had an attack

of cold or "Grip," which confined her to her room and bed for several days. From this she had rallied and gained sufficient strength to go about her house and grounds, visit the neighbors and do shopping in the city of Wheeling, distant from Triadelphia, where she lived, several miles, but accessible by trolley cars, and converse with her friends and neighbors, in the month of May, 1901, when the note was executed. A stranger, in whose presence she signed it, testifies to her having been in Wheeling on that day, and a merchant from whom she bought goods testifies to her having been there on June 3. 1901. She continued to go about during the summer and until a few days before her death. As is usual in all such cases, there is conflict in the evidence as to her mental condition, many of the witnesses being of the opinion that she was wholly incapable of transacting business, and others of contrary belief. Assuming it to be true, however, that her conversation was, at times, somewhat disconnected and that persons who knew her, even a physician, were of the opinion that she did not possess the mental strength and capacity, obtaining ordinarily in the transaction of business, in other words, average business capacity, the facts disclosed, concerning her conduct and powers, having greater probative value than mere opinions, and the burden of proof being on the party alleging incompetency, we have no hesitancy in saying the evidence fails to establish it. Old age, sickness, abatement of mental vigor and impairment of memory does not, under our decisions, rebut the legal presumption of mental competency to transact business. *Teter* v. *Teter*, 59 W. Va. 449; *Farnsworth* v. *Noffsinger*, 46 W. Va. 410; *Eakins* v. *Hawkins*, 52 W. Va. 124; *Delaplain* v. *Grubb*, 44 W. Va. 612; *Buckey* v. *Buckey*, 38 W. Va. 168. As was intimated in *Teter* v. *Teter*, mental competency does not require the sagacity, analytical powers, astuteness and soundness of judgment, requisite to the making of just such a contract in every instance as an experienced, skillful and shrewd man would make. It suffices that a person in making a will or executing an instrument to operate as one, knows what property he has and what he wants to do with it.

The introduction of evidence to prove procurement of the

note by the exercise of undue influence necessitates a fuller and more critical examination of the evidence bearing on the exact state of the decedent's mind at the time of the execution thereof than would otherwise be required, for the obvious reason that a feeble mind can be more easily overcome and subordinated to the will of a designing person than a strong one. The evidence relied upon to prove extreme mental weakness is substantially as follows: Declarations of Benoni Feay to whom the note was executed, made a short time before the execution thereof, to the effect that she was crazy and that he was staying at her house and taking care of her for that reason, were proved. Mrs. Rankin, a niece of the decedent, living several miles away, testified that about the first of May, 1901, she had visited her and extended an invitation to return the visit, which was accepted, and, a few minutes afterwards, Feay told the witness, in the absence of Mrs. Thornburg, that she would not come and that she did not know what she was talking about. Mrs. Neff, a niece of the decedent, who also resided several miles away, testified that she, in company with Mrs. Rankin, visited her about the first of May, 1901, and found her both mentally and physically weak, and that she heard the statement made by Feay to which Mrs. Rankin testified. Both of these witnesses say she was suffering from a heavy cold and had symptoms, as they thought, of pneumonia. Mrs. Jennie Anderson testified that Feay told her he was staying with his aunt because she was old and childish and any one of the heirs could come in and persuade her to do anything. Both Mrs. Rankin and Mrs. Neff, as well as other witnesses, testify that in April, 1901, and about the first of May of that year, Mrs. Thornburg talked disconnectedly, her mind sometimes wandering from the subject of conversation, and that she talked more intelligently of things which had happened several years prior to the date of the conversation than of recent happenings. Miss Martha Thornburg, who had worked for the decedent for several years, until a short time before the note was executed, says that, in May before her death, as she thinks, she visited her and they talked of settling a balance due for labor. This witness says of the conversation: "I understood what I was talking about, I am not sure about her. As she

would tell me one day that she would pay me, and right away then she would say that I had never worked any for her at all, and that she did not owe me anything. Then she would turn right around and say that she would pay me, but that she had no money." D. S. Thornburg says her mind was not what it had formerly been. Herman Weiss, neighbor, on being asked if she would answer intelligently, said: "To a certain extent, yes. She would change off to other things before she was through with what she was talking about." Dr. Carter, her physician, testified that he had attended her in October and November of 1900, and again in April, 1901, and that after her sickness in the fall of 1900, her mental condition was such, in his opinion, that she could be influenced in favor of any one that she liked or against any one whom she might suspect of having designs upon her generosity, and that her mind was weakened through age, infirmity and disease. Having testified to this condition and defined it as *senile dementia,* he said he believed she could understand a simple uncomplicated contract, if thoroughly explained, but doubted if she had sufficient ability to recognize any claim that any heir might have upon her, and that was not in constant attendance upon her. Miss Askew testified that in the spring of 1901, Mrs. Thornburg came to the house where she and Mrs. Mitchell lived and had dizzy spells and was forgetful; her conversation was someweat broken; and that on one occasion when she was making a dress for her, Mrs. Thornburg had sent word that she was coming for it, and did come in spite of notice not to do so, as the work of making had not yet been commenced, saying she had forgotten the notice given her. Mrs. Mitchell says she saw Mrs. Thornburg frequently during the year 1901, about eleven times and that she was weak, nervous and forgetful, and one instance of forgetfulness mentioned was the miscalling of the name of Martha Thornburg in connection with some incident about which they were conversing on a certain occasion. On the other hand, Mrs. Mitchell says Mrs. Thornburg, on one of these occasions, brought to her sister, Miss Askew, goods from which to have a dress made that they were of the requisite quantity and the lining matched, and she appeared to know just what she wanted and to have used very good taste in

the selection of the goods and in giving directions as to how the dress should be made. As has been stated, a number of witnesses testified to Mrs. Thornburg's ability to go about the premises, visit her neighbors and converse and transact more or less business. Miss Askew testified to having seen her at a neighboring store purchasing supplies, carrying her money with her, tied up in packages and deposited in a tin bucket, and conversing about her affairs and her relation with Benoni, saying she never asked him to do anything she could do for herself and that he would promise her many things that he would not do. Dr. Carter says that, in his conversation with her in regard to her physical condition, her answers were intelligent. Louis Bertschy, a Wheeling merchant, apparently wholly disinterested and a stranger to the parties, testified that on Monday June 3, 1901, Mrs. Thornburg and Benoni Feay came into his place of business, asking to see some bedsteads, and that, after having conducted them to the second floor, they looked at bedsteads of a certain kind and Mrs. Thornburg asked Benoni as to his preference and he told her to suit herself. Soon afterwards Benoni went out and the negotiations were completed between the witness and Mrs. Thornburg herself. She selected two bedsteads, costing five dollars each, gave directions for shipment, her residence being outside of his delivery territory, and paid the bill in cash. He further says "When she was through I asked her age, and I think she replied 80, whereupon I answered that she appeared very bright for a person of this age." After she had paid the bill, he bade them good-day and she told Benoni to come on and carry the basket for her, and, at the door, as witness turned to leave them, he heard Benoni ask her where she wanted to go next. The note was executed in the office of the Wells-Fargo Express Company, in the presence of J. F. Dick, agent of said company, who testifies that Benoni Feay and an elderly lady came into his office and asked the privilege of using a pen and ink which he handed them, and she took the pen and signed the note with it, whereupon he commended the writing in view of her apparent age and disuse of glasses, and she replied "Yes, I have my second sight." He further says that after signing the note she handed it to Mr. Feay and

said: "I want you to have this" or "want you to have that." Witness further says he had previously seen Feay but did not know his name, nor the name of the lady until she had signed the paper. Mrs. Thornburg lived in Triadelphia and owned a farm near there. James I. Newhart was her tenant in the year 1901, and says that, prior to the first day of June in that year, he saw her every two or three days and conversed with her and that she told him she was going to the city to buy a carpet and bedstead and soon afterwards showed him the carpet and bedstead she had bought. Being asked how frequently he had seen her and talked with her or had dealings with her, he said "Every week or so," and that, in the spring and summer of the year in which she died, her mind was just as good as it ever was. E. C. Burkham says he saw Mrs. Thornburg two or three times a month in the spring and summer before she died, frequently passed her house and very often she would be in the yard and they would stop and talk to her, and that he made social calls and noticed nothing about her conduct or talk that indicated any weakness or feebleness of mind, that he always considered her mind good, and that she was not easily influenced. The record contains a good deal of similar testimony from other witnesses which cannot be detailed here for want of time and space. Enough of the evidence on both sides to indicate very clearly both its character and quantity, as regards mental condition, has been stated.

The facts bearing on the relations of the parties and brought into the record as tending to prove and disprove undue influence, as well as consideration, and lack of consideration, are about as follows: In 1889, Mrs. Thornburg was a maiden lady about 70 years of age, living on her farm, situate near Triadelphia in Ohio county, and married H. Shepherd Thornburg, a widower, who had a daughter, Martha, then about 45 years of age, and unmarried, and thereafter her husband resided with her on that farm until the winter of 1900, when he died on Christmas day. Martha Thornburg, after the second marriage of her father, resided with her brother in Triadelphia, for a while, and then by herself until February, 1896, when she was employed by her father and step-mother as house-

keeper and servant, and thereafter resided with them until the death of her father, and, after his death, until in April, 1901, at which time Mrs. Thornburg had removed to Triadelphia, having rented her farm to Newhart. Long before the marriage of Mrs. Thornburg, Benoni, then a young single man, a nephew of hers, resided with her and worked for her a number of years, just how long is left in some uncertainty, but that he worked for her for a number of years is beyond doubt. There is some uncertainty also as to the extent and value of his services, but that he rendered some services and of some value is indisputable. He married before Mrs. Thornburg and there is testimony tending to show that, while he did not thereafter reside with her, he continued to render her services on the farm, until her marriage. After that date, their relations as employe and employer seem to have ended, and were not renewed until after the death of her husband and her removal to Triadelphia. During this period of cessation, Miss Thornburg remained with her and says their relations were of the most intimate character, being close and confidential, each trusting the other and relying upon the other for kindness and attention. When Mrs. Thornburg was ready to remove from the farm to Triadelphia, Benoni appeared with a team and conveyed her and her effects to town, and, from that time, his services and attention to her seem never to have ceased until the time of her death. Miss Thornburg says that, immediately after the removal, she began to notice an intimacy between her step-mother and Benoni, in this, that they spent much of the time together in close confidential conversation. She would find them sitting in a room talking together, while she was doing the work about the house, and, on her entrance into the room the conversation would immediately cease. This proved so embarrassing to her that she soon ceased to interrupt them; and finally Mrs. Thornburg became, or pretended to become, offended because of certain arrangements or disposition of furniture she had made in a room in the residence, and she was discharged. Mrs. Thornburg told her to go or that she might go, and she did so. In April, 1901, and from that time until the death of Mrs. Thornburg, Benoni Feay spent practically all of his time there.

Though he had a family of his own, his relations with them during this period, are uncertain. His wife was visiting in the west and it does not appear whether his house was occupied or not. He had a daughter and a step-daughter, the latter of whom was a married lady, but where the former staid and what she did are not very clearly disclosed by the evidence. At any rate, it is certain that Benoni spent by far the greater portion of his time at the residence of Mrs. Thornburg. The character and extent of his services are left in some doubt by the evidence, but it is quite clear that he rendered some services about the house and accompanied her when she left the house on business. He had the freedom of the house and was apparently in substantial control thereof, when Mrs. Thornburg was, owing to her sickness in October, 1901, unable to look after it. At the time of her last sickness, he had the keys to a bureau in which she kept her money and some clothing. The neighbors and friends who came in to assist in caring for her had to apply to him for such articles of clothing as were needed. His admissions as to the reasons for his staying there have been stated, and to these may be added the further one that shortly after her death, on being asked what disposition she had made of her property, he said substantially, you will hear after awhile and will see later on how the cat will jump. There is also testimony to the effect that, when relatives of Mrs. Thornburg, particularly those by marriage, the Thornburgs, came to see her, Benoni was always present, with the apparent intention and purpose of preventing any conversation with her respecting the disposition of her property. On the other hand, several witnesses testify to declarations, on the part of Mrs. Thornburg, of her intention to reward Benoni for the services he had rendered her, by leaving to him all or practically all of her estate. E. C. Burkham, a step-son of Benoni Feay, says that about February 1, 1901, at Mrs. Thornburg's old homestead, he had a conversation with her in which she said she wanted her estate divided between Bertha (a daughter of Benoni,) Benoni Feay, and Moses Feay (Benoni's father,) and that she did not want any of the other heirs to get it, as she did not think they had treated her right. Margaret Feay, wife of Benoni, says

Mrs. Thornburg said she wanted Benoni to have what she had and said a great many things about what he had done and, among other things, that he had always done what she wanted done. She further says that such remarks were often made and that, in February, before her death, she wanted Benoni and Bertha to have it and would like for Moses, her brother, to have a little, as he was getting old, but did not want the rest to have anything. Moses White, after having testified to a long acquaintance with Mrs. Thornburg, as well as to services performed for her by Benoni, says she told him that Benoni was awfully good to her and to wait on her and that she would remember him. Mrs. Gussie DeWitt, a step-daughter of Benoni Feay, says she knew Mrs. Thornburg intimately. and that she had told her that Benoni was to wait on her and he and Bertha were to receive what she had; that she had never paid him for anything and expected to leave him what she had, in order to repay him for the services he had rendered her during her life; that she had told her frequently that Benoni had done for her and none of the rest had and he was the one who should be repaid for his services after she was gone; and that this declaration was made to her as late as the year 1900. Against this testimony as to her intention, J. M. Thornburg, a step-son of the decedent, testified that on one occasion, while his father was living Mrs. Thornburg had said she had had more trouble with Benoni than she would ever have again, that she had paid more for him than she would ever pay again. This conversation occurred after she or she and her husband had bought a piece of property in Triadelphia, which Benoni had previously purchased and for whose purchase Mrs. Thornburg had become security. The circumstance most strongly relied upon as indicating the exercise of undue influence is the sudden entry of Benoni Feay into the home of the decedent and disappearance therefrom of Miss Martha Thornburg. Her testimony tends to show that he availed himself of her friendly and kindly disposition toward him and inclination of long standing to rely upon him for such attention and assistance as he gave her, to obtain the exclusion from the house and from her company of other relatives of the family and to make himself master of the situation; but she

details no circumstance of coercion or over-persuasion. She never heard what passed between them in conversation, not anything, at least, that pertains to the disposition of her property. He says that soon after they came to Triadelphia, Miss Martha gave him short words and manifested unfriendliness, thus showing aversion to his presence there. On the occasion of the execution of the note, there was no visible or audible persuasion or coercion. The note having been prepared on that morning, according to the testimony of Benoni, by a Mr. Meyer, in the city of Wheeling, the parties stepped into the express company's office, as a matter of convenience, obtained a pen and ink, and Mrs. Thornburg voluntarily and deliberately signed the note in the presence of Dick.

The proposition asserted that the burden of proof is on him who charges procurement of execution of an instrument by the exercise of undue influence, a species of fraud, is as firmly established and universally recognized as the kindred one that he who alleges mental incompetency must prove it. *Teter* v. *Teter*, 59 W. Va. 449; *Delaplain* v. *Grubb*, 44 W. Va. 612; *Doran* v. *McConlogue*, 150 Pa. St. 98; *Boggess* v. *Boggess*, 127 Mo. 305; 29 Am. & Eng. Ency. Law 133. As has been stated, there is no direct evidence of inducement, persuasion or coercion on the part of Benoni Feay or any other person in his behalf. Mere circumstances, consistent with pure motives and innocence of fraudulent intent. constitute the only evidence relied upon, Assuming that he interfered between the decedent and her step-daughter and caused her discharge, it does not follow that he procured this note by over-persuasion or coercion. If the admissions given in evidence against him, to the effect that his presence there was due, in part, to the fear that others might take advantage of Mrs. Thornburg's weakness and physical necessities and procure a disposition of the property in their interest, be taken as true, the most that can be said for it against him is, that the matter of the disposition of her property engaged his attention at the time and gives rise to a suspicion, a mere suspicion, that he may have had a fraudulent purpose and improper motive in bestowing upon her the care and attention which he gave her. But it is only a matter of inference, founded upon

conduct and circumstances perfectly consistent with his innocence of any intention or endeavor to take advantage of her.  The additional circumstances that he expected her to leave him practically all of her estate by way of compensation for the long years of service he had rendered her in his early manhood and her knowledge of this expectation on his part, affords ground for the inference that he requested her to execute the note; but such a request does not constitute undue influence.  *Doran* v. *McConlogue*, 150 Pa. St. 98.  In that case there was positive proof of unequivocal solicitation on the part of the grantee in the deed, the grantor having been afflicted with paralysis and greatly enfeebled both physically and mentally, much more so than was Mrs. Thornburg.  The syllabus of that case says: "Moderate solicitation to procure a deed, even when accompanied with tears, does not constitute undue influence."  Much argument is found in the brief, predicated on the theory of a confidential relationship, casting upon Feay the burden of proving the fairness and voluntariness of the execution of the note.  The blood relationship subsisting between the parties does not constitute a confidential relation, raising the presumption of undue influence.  "No presumption arises that transactions *inter vivos* or wills in favor of a nephew or niece were procured by undue influence exerted by such beneficiary, and it is not usually a circumstance of any particular weight."  29 Am. & Eng. Ency. Law 134.  Neither is the fact that Feay, acting in the capacity of servant, or nurse or care-taker, or all these positions with reference to the decedent, sufficient to raise a presumption of undue influence.  It is a mere circumstance admissible in evidence, because such positions afford opportunities for imposition.  *Id.* 134.  All these circumstances, together with the testimony, tending to reflect upon the credibility of Feay, such as contradiction in his testimony and conduct, must be considered in connection with all the other facts.  Though Mrs. Thornburg did not possess her former mental power and capacity, she was by no means helpless nor incapable of appreciating and remembering her situation and her surroundings.  She was able to converse intelligently, though not smoothly and eloquently.  She could make all her wants and wishes known and was able to go about, visiting her neighbors, conversing

with them, and to transact business. If the Wheeling merchant is to be believed, and he is in no way discredited, she was able not only to make an intelligent purchase, but to give directions as to delivery, and prudent enough to obtain the advantage of prepayment of freight. She was yet in control of her own funds, having her money with her, and did not in any degree rely upon Benoni to supervise or control her purchase or take care of her money. Her change of disposition toward Miss Thornburg may have been due to altered circumstancs in life, her husband having died and thus substantially broken the tie existing between her and his kindred. It would be most natural, in view of her approaching end, the indigent condition of her brother and the poverty of her nephew, for her mind and affections to incline toward them rather than toward those who were strangers to her in blood. The execution of the note is consistent with her many declarations of intention favorable to Feay, as well as the relation existing between them, broken by her marriage, and resumed after the death of her husband. If Feay faithfully served her for a long period of time in the early years of his life, without compensation, and she had then intended to reward him by making some provision for him at the close of her life, which intention was interrupted or suspended by her attachment to the man whom she married, the severing of that new tie by the fact of death, would most naturally open the way for the effectuation of her original purpose and intent. In the absence of evidence showing any positive and direct act of undue influence or admission of the exercise thereof, these circumstances and considerations must prevail over inferences and suspicions arising from relations and transactions not at all inconsistent with them. That Mrs. Thornburg signed the note, reciting a valuable consideration, is clearly established, and her solemn act, consistent with circumstances which may well be supposed to have lead to the result, cannot be overthrown by alleged inferences which amount to nothing more than mere suspicion. *Teter* v. *Teter*, cited. The commissioner and the circuit court, in disallowing this claim, seem to have proceeded upon the theories, that the execution of the note was an act in itself so improvident

and reckless as to condemn it, as being the act of a person mentally unbalanced or unduly influenced; that there was a confidential relationship between the parties, or circumstances developed, which placed them on an unequal footing, and cast upon Feay the burden of proving full and adequate consideration and the fairness of the transaction; that there should have been an accounting between the parties; and that Feay, having procured the preparation of the note and obtained the signature, it devolved upon him to show that he had it prepared in pursuance of a previous arrangement or understanding with the decedent; and the absence of evidence other than his own testimony, tending to show that she knew the contents of the paper she signed is adverted to as a circumstance strongly indicating fraud or undue influence. We have already seen that there was no confidential relation and that the circumstances did not place the parties on an uneqal footing, and that the relations existing between the parties made the transaction reasonable and just. The views or suggestions upon which the decision seems to rest are variant from the law, in that they impose the burden of proof on the wrong party.

Some testimony to the effect that Feay had admitted the note had been given to him, is made the basis of an earnest argument against its validity and binding effect; but all these expressions and admissions were connected with, and qualified by, the further statement that it was by way of reward or compensation for services. In addition to all the evidence hereinbefore detailed, relating to the matter of consideration, showing beyond doubt that there was some service rendered the decedent, both before and after the death of her husband, we have the solemn recital in the note itself that it was given for value received. In view of all this, the contention that it was a gift and not founded upon any valuable consideration must be rejected as wholly untenable.

Inadequacy of consideration is also urged against the claim, but it cannot avail. There is too much authority for the proposition that where parties have deliberately agreed upon the value of services or any other matter, the courts cannot interfere, unless it be so great as to be in itself evi-

dence of fraud. This is the rule obtaining in matters of pure contract, regarded and treated as business transactions, affected between persons who expect to continue to do business and who are not presumed to have injected into the transaction anything of generosity or liberality, transactions in which dollars and cents were the only considerations. But this rule, is qualified when the transaction is one in the nature of a testimentary disposition. This woman, considering life almost at an end and remembering the moral duty and obligation resting upon her in favor of her nephew, did what many others have done, executed an instrument giving to him practically all she had by way of reward and compensation, in execution of an intention which she had long previously formed, well known to, and relied upon by him. "The plaintiff rendered valuable services to the defendant's testator, who was her brother, and nursed and attended him through a severe illness, for which he promised to reward her. Upon his recovery, he delivered to her a sealed envelope, superscribed with her name, and the addition, "this is not to be unsealed while I live, and to be returned to me any time I wish it;' signed by him. He subsequently made a will containing a bequest in her favor. After his death, she opened the envelope and found therein a writing in the form of a promissory note for $10,000, payable to her on demand, signed and duly stamped by the testator.—*Held* (Lott, Grover and Sutherland, JJ., *contra*,) this instrument was a valid promissory note, upon which the plaintiff could recover against the estate of the testator." *Worth* v. *Case*, 42 N. Y. 362. "A promissory note given in consideration of future services to be rendered by the payee, upon the rendition of the services in reliance thereon, becomes valid and binding, although there was no agreement at the time of the giving of the note upon the part of the payee to render them, and although the amount of the note be much greater than their value." *Miller* v. *McKenzie*, 95 N. Y. 575. "Defendant's testator, having taken by mistake a fatal dose of aconite, and being aware of his approaching death, executed and delivered to plaintiff—who had been his housekeeper for seven or eight years, and to whom he was indebted for services—a promissory note for the sum of $10,000, the

consideration expressed being "for services rendered." In an action upon the note, *held*, that it was valid, although the amount was greater than the value of the services. *Earl v. Peck*, 64 N. Y. 596.

For the reasons stated, so much of the decree as overrules the exception of Benoni Feay to the commissioner's report and confirms the same as to said Feay's claim and disallows it must be reversed, said exception sustained and the cause remanded with directions to allow and decree said claim to be a debt against the estate of said Rachel Thornburg, and to further proceed therein according to the principles herein stated and further according to the rules and principles governing courts of equity.

*Reversed. Remanded.*