# CHARLESTON.

## CLARA M. WADE v. ARTHUR SAYRE *et al.*

Submitted February 26, 1924.   Decided May 6, 1924.

1.  DEEDS—*Evidence Held Insufficient to Prove Grantor Insane, Notwithstanding Previous Adjudication of Insanity.*

    Where it is shown that a single woman has been adjudged insane in 1908, and is committed to a hospital for the insane, where she remains in the custody of that institution for three months, and is released on bond and parole, and two years thereafter, obtains title to a tract of land, and five years thereafter is married and that both before and after her marriage, she transacts business of importance with reference

to her property, procures a conveyance to her husband of a one half interest therein and, in 1917, she and her husband convey said tract of land to another, for the full value of the same and afterward she and her husband invest the money derived from said sale in other property, and she sells her interest in said other property and conveys it and releases the vendors lien which she and her husband retained on the tract of land in controversy; and there is no evidence of her insanity at the time any of the conveyances were made, and the preponderance of the evidence is strongly in favor of her sanity at the time these conveyances were made; it is error for the lower court to set aside such deeds made by the plaintiff, notwithstanding she had been adjudged insane in 1908.    (p. 373).

2.   SAME—*Mental Capacity of Grantor Determined as of Time When Deed Was Executed;. One Who Attacks Validity of Deed Must Show Grantor's Mental Incapacity at Time Deed Was Executed.*

In determining the mental capacity of a grantor in a deed, the time to be looked at and carefully weighed, is the time when the deed was executed, and one attacking the validity of a deed on the ground of mental incapacity of the grantor must show by a preponderance of the evidence that at the time said deed was executed    the    grantor was of unsound mind.    (p. 373).

3.   SAME—*Burden of Proving Insanity Held on Grantor, Notwithstanding Previous Adjudication of Insanity.*

Where it is shown that one has been adjudged to be a person of unsound mind and confined in a hospital for the insane where she remains in custody for three months and is released on bond and parole, and it is further shown that two years after such release she is capable and competent to attend to her business and that she does transact important business in a capable manner; and she seeks to set aside certain deeds made long after she had been discharged on the ground that she was insane at the time they were executed, the burden is upon her to show that she was actually of unsound mind at the time said deeds were executed.    (p. 373).

4.   SAME—INSANE PERSONS—*Rule as to Burden of Proof of Insanity Stated; Insanity in Civil Cases Proved by Preponderance of Evidence; Deeds Not Set Aside if Evidence Shows Competency at Time of Execution Notwithstanding Former Adjudication of Insanity.*

In all civil actions the burden of proof of insanity rests upon the person who alleges insanity or seeks to avoid an

act on account of it, and it devolves upon such person to es-' tablish the fact of insanity by a preponderance of the evidence. If however a previous state of insanity is proven the burden of proof is then usually considered to shift to him who asserts that the act was done while such person was sane, but if a decided preponderance of the evidence shows that such person was sane at the time he executed the certain deeds and was sane both before and after the execution of the same, the court will refuse to set aside said deeds notwithstanding the former adjudication of insanity. (p. 373).

Appeal from Circuit Court, Wetzel County.

Suit by Clara M. Wade against Arthur Sayre and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

*Thayer M. McIntire,* for appellants.
*E. H. Yost, Walter F. Ball,* and *M. H. Willis,* for appellee.

McGINNIS, JUDGE:

This is a chancery suit brought by the plaintiff, Clara. Wade, against Arthur Sayre, William R. Payne, J. D. Sapp, Frank Sapp and the Manufacturers Light and Heat Company, a corporation.

Plaintiff's bill alleges that in the year 1908, she was duly adjudged insane and committed to the hospital for the insane at Weston; that about three months after she was committed and so confined, her father, William Wade, executed a proper bond by which he bound himself to take proper care of the said plaintiff and maintain her in a proper and humane manner, to properly restrain her and see that she did no injury to herself or others and, upon the execution of said bond, she was released from said hospital on parole and placed in the care and custody of her father; that since the date of adjudication and up to the year 1919, and at all times intervening said dates, she was of unsound mind, not competent to execute a deed; that in September, 1913, she married the defendant William R. Payne; that previous to her said marriage, about two years after she had been released from the hospital, to-

wit, on the 23rd day of December, 1910, her father conveyed to her a tract of 46 acres of land on the waters of Knob Fork in Center District, Wetzel County, West Virginia; that she and her said husband, on September 30, 1916, executed and delivered to the defendants J. D. Sapp and Frank Sapp a deed for said 46 acre tract of land; that this deed was not her deed; that there was no consideration paid to her and that it was obtained by trickery and fraud. And that on October 28, 1916, the Sapps executed a deed to plaintiff and her said husband, William R. Payne, for said land; that the said Sapps and the defendant, W. R. Payne, at all times had full knowledge of her enfeebled, debilitated and unsound mind and body. That on the —— day of July, 1917, the plaintiff and her said husband conveyed said land to the defendant Arthur Sayre; that the consideration paid and to be paid was $1840.00, and $1400.00 of said consideration was paid in cash and the residue amounting to $440.00, was to be paid in six and twelve months with interest, for which deferred payments the defendant Sayre executed his notes and a vendor's lien was retained for the unpaid purchase money. These purchase money notes were given as follows: two to plaintiff for $110.00, each payable in six and twelve months respectively, and two to the defendant W. R. Payne for like sums payable in like manner. The bill further alleges that the plaintiff was of unsound mind at the time this deed was executed and not competent to execute a deed, and that the defendant, Arthur Sayre, well knew at the time of the signing and delivering of said deed that the plaintiff was of unsound mind.

The prayer of the bill is that the deeds mentioned therein as exhibits "B" and "E", which are the deeds to the Sapps and to defendant Sayre, respectively, be set aside and annulled. There was no tender or offer to pay to the defendant Sayre the purchase money paid by him for the land, the plaintiff alleging in her bill that she is unable to repay said purchase money should the court so direct.

The defendant Sayre answered and denied all the material allegations of the bill except that the plaintiff was at one time adjudged to be of unsound mind and committed to the Weston Hospital for the Insane at Weston, but denies that

she was of unsound mind at the time of the execution of the deeds sought herein to be set aside; that he had no knowledge of the deeds made by the plaintiff and her husband to the Sapps and from them to plaintiff and her husband, William R. Payne.

Many depositions were taken on the question of the soundness of plaintiff's mind, and much of the proof as set forth therein is of little weight, consisting mainly of the opinions of non-expert witnesses based upon frivolous or immaterial facts. The proof shows that the plaintiff was in fact adjudged insane in 1908 and committed to the asylum at Weston; that she was released on bond and that for some time after she was released from the asylum, she was feeble both in body and mind. In 1917, during July and August, she was treated by Dr. Fortney during which time, she was nervous and cried many times, told her troubles and discussed her situation, there was not a statement made by the plaintiff to the doctor nor was there anything she did that had the least tendency to show that the plaintiff was insane or incapable of executing a deed.

She told the doctor about her domestic troubles and the hallucinations of her husband. She knew that she owned this property, she told this doctor that she had either sold or was about to sell it, and spoke of placing the money in the bank. The doctor gives as her opinion, that she was not capable of transacting business, and this opinion is entitled to some weight, though the reasons she gives for her opinions are frivolous. She was nervous and frequently cried without apparent cause. These afflictions, if afflictions they may be termed, are so common among women that it would hardly be just to them to say, that when a woman cries or when she is nervous, she is of unsound mind.

The other witnesses, and there were quite a number testifying on both sides of this controversy, are, with three exceptions, non-experts. The experts are Doctors Teagarden, Limely and Anderson. Dr. Teagarden knew nothing of the plaintiff's condition since 1908 at which time he was one of the physicians who testified as to her mental condition at the time she was adjudged insane and committed to the insane

asylum at Weston, at that time he states she was insane. He testifies also of the insanity of her brothers, LeRoy Wade and Spencer Wade. He also testifies that after she was released from the hospital, she had to be fed with a stomach pump; that he knew nothing of her since 1907 (meaning evidently 1908). Dr. Limely knew plaintiff in 1914 and 1915 and treated her for a female trouble. He says he could not say that he observed anything about her talk that would indicate insanity. Dr. G. W. Anderson first knew plaintiff in 1920. He says that she was sane at that time. Plaintiff asked Dr. Anderson's advice as to how she could get a release from the insane asylum, meaning doubtless, a certificate showing that she had been restored to sanity, and in the Spring of 1921, he and one Dr. Porter signed a paper for her in reference to the matter of obtaining the certificate she desired. William Furbee, at whose home the plaintiff lived from 1908 until she was married in 1913, states that after the plaintiff had been confined in the Weston State Hospital for the Insane for about three months, her father, W. M. Wade, entered into a bond and that she was brought from the hospital to her father's home and that, at that time, she was in a very feeble condition; that she refused to take any nourishment and had to be fed with a stomach pump; that from 1908 to 1913, she resided at witness' home except three months during which time she resided with Thomas Barrett; that after she returned to Furbee's home from Thomas Barretts', she no longer had to be fed with a stomach pump but that she refused to eat when anyone was in the room where she was, and her food was placed on a table and she would eat when there was no one in the room. He says that he saw the plaintiff once in June, 1917, which was the only time he had seen her since she was married in 1913. He did not think she was sane in June, 1917. All he heard her say on that occasion was that she believed, "all three of us shot at Bill Payne." It appears that Payne had sworn out a warrant for the arrest of witness Furbee and two others for shooting at him. Witness says he does not know the condition of plaintiff's mind at the time she and her husband executed the deed to the Sapps. This witness also testifies as to the insanity of

two brothers of the plaintiff, one of whom—Spencer Wade had been confined in the Hospital for the Insane at Weston twice, and the other—LeRoy Wade, had been so confined five times and finally committed suicide. He further testified that Alonzo Wade, a nephew of the plaintiff, was also adjudged insane and sent to said hospital. The witness Furbee is a brother-in-law of the plaintiff.

Witness Barrett, another brother-in-law of the plaintiff, testifies that the plaintiff was not capable of transacting business, he testifies about the condition of plaintiff about the time she was released from the hospital but does not know the condition of her mind in 1917; that plaintiff lived at Hundred then, and that he had no conversation with her while she lived at Hundred. It seems, however, from the witness's statement, that the plaintiff on two occasions, came to him to have him certify her acknowledgments to a deed and release, which acknowledgments he took as notary and certified; the release so certified by the witness was a release of the vendor's lien retained by her in the deed to Arthur Sayre for the land in controversy, and the deed was a conveyance of land in Ohio which plaintiff and her husband purchased with the money derived from the sale of the land, in controversy, to the defendant Sayre.

The plaintiff examined eleven witnesses, not one of whom knew or pretended to know the mental condition of plaintiff's mind at the time the deed was executed. They established the fact that she was adjudged insane in 1908, and released on bond in about three months thereafter, and that her physical condition for some time thereafter, was such that she was not capable of transacting any business; that two of her brothers had been adjudged insane, one was sent to the asylum five times and the other two or three times; that their aberrations were periodical, part of the time they were apparently sane. The testimony of Frank Sapp is to the effect that the deed, made by plaintiff and her husband to him and his brother J. D. Sapp, was made for the sole purpose of transferring a one-half interest in the land to the husband of plaintiff; that no consideration passed for either the conveyance to the Sapps or for the deed from them to the plain-

tiff and her husband; that the notes were executed by the Sapps for the purchase money, but the understanding was that these notes were to be returned for cancellation when the deed to the plaintiff and her husband was executed, and this was done. This witness states that he talked to the plaintiff, privily and apart from her husband, about these transactions and she seemed to understand fully their purport, and at the time these deeds were made, to the Sapps and from the Sapps to the plaintiff and her husband, there is no proof showing fraud and misrepresentation or undue influence exercised or practiced upon the plaintiff; on the contrary the proof by plaintiff's witnesses shows that these deeds were made at a time when the plaintiff was in full possession of her faculties, and that they were executed with the full knowledge of the plaintiff as to their effect. From the testimony of the plaintiff's witnesses, it is also shown that in 1910, two years after plaintiff had been adjudged insane, her father W. M. Wade conveyed to her the land in controversy; that three years after said conveyance to her, she married William R. Payne; that before that time she leased the land for oil and gas; that in 1916, she and her husband executed the deed to the Sapps, and accepted a deed from them to her and her husband for the land, and in 1917, she and her husband conveyed the land to the defendant Sayre, and that with the money derived from the sale of the land, she and her husband purchased land in the state of Ohio; that some time thereafter, she sold her interest in the Ohio land upon which she and her husband had resided; that after she sold her interest in the Ohio land, she returned to West Virginia in 1917, and that after she returned, she conveyed her interest in the Ohio land and released the vendor's lien retained in the deed to the defendant Sayre. In June 1918, plaintiff instituted an attachment proceeding against her husband and obtained a judgment for $120.30 against the garnishee, the Bank of Hundred; that on the 6th day of April, 1921, she obtained a certificate discharging her from the Weston State Hospital as being restored to sanity. She obtained this certificate notwithstanding the fact that she had not been confined in the hospital for thirteen years, and during that inter-

val, she apparently had been attending to her affairs, selling and conveying property and engaging in the business transactions above enumerated.

No witness offered by the plaintiff testified as to the condition of her mind at the time she executed the deed to the defendant Sayre, and though admittedly restored to sanity, she does not take the stand in her own behalf. She either knew or she did not know the condition of her mind at the time she and her husband executed the deeds in question here, and she fails to testify. She is the plaintiff in the case, she and the notary and her husband and the defendant Sayre were the only persons present at the time the deed to Sayre was executed. The presumption is that had she given testimony, it would have been against her contentions. *Hefflebower* v. *Detrick,* 27 W. Va. 16.

The defendant introduced quite a number of witnesses who testified to the sanity of the plaintiff. It is shown that the plaintiff and her husband called on the defendant Sayre and offered to sell him the land; that they agreed upon the price and the payments, and that the amount they received was the full value of the land, and the defendant Sayre states that he is now willing to sell the land for the same amount he paid for it. The greatest value placed upon the property by the witnesses for plaintiff is $2000.00. The officers who took the acknowledgment to the deeds in question testify to the fact that the plaintiff was apparently in possession of her mental faculties at the time the deeds were executed.

W. J. Anderson, the officer who took the acknowledgment of the deed to the Sapps, says that he examined the plaintiff privily and apart from her husband and that her mind, in his opinion, was sound. She knew what she wanted to do with her property and discussed its disposition and her reason for desiring her husband to own a half interest therein and said that if anything happened to her she wanted him to have her part. This witness also testifies that he was at her home a number of times after she was married and had had conversations with her and that he never detected anything wrong with her mind. That she was nervous was all the defects he could observe. Many other witnesses testify to her sanity.

Toothman, the cashier of the Bank of Hundred, testifies to the details in reference to the execution of the deed to Sayre. Toothman drew the deed, certified the acknowledgment and wrote the notes for the purchase money and the plaintiff and her husband discussed the transactions with him and he says that he considered her of sufficient mind and memory to transact business. That he saw nothing to indicate that she was of unsound mind.

The lower court found that the plaintiff was insane at the time the deeds mentioned to and from the Sapps were executed, and that she was insane at the time the deed was executed to the defendant Sayre and set aside and annulled all of said deeds and required the plaintiff to pay the defendant Sayre $920.00, which amount was ordered to be paid to the clerk of the court for said Sayre, and, upon the payment of which the decree is to become effective. It also decreed that the defendant W. R. Payne pay unto the said Arthur Sayre the sum of $920.00, which amounts, the decree recites, are the respective amounts received by the plaintiff and her husband for the sale and conveyance of the land in controversy and decreed costs against the defendant.

We are of the opinion that the court erred in entering this decree. The testimony of the plaintiff fails to make out a case. We fail to find such material conflict in the testimony as will invoke the rule relied upon by the plaintiff, that "Where the evidence is conflicting on questions of fact, the Supreme Court will not disturb the finding of the lower court." Citing many decisions of this court. While we still adhere to this rule, we hold that there must be some material conflict in the evidence. In this case we find no such conflict. Here we find the plaintiff adjudged insane in 1908, obtaining a deed for the land in controversy in 1910, leasing the land for oil and gas in 1912, contracting marriage in 1913, conveying the land to the Sapps in 1916 for the purpose of vesting in her husband title to a one-half interest in same and accepting the deed to her and her husband from the Sapps, a sale to Sayre of the land in controversy in 1917, a purchase by herself and husband of land in the state of Ohio, the sale of her interest in the land, and the release of the vendor's

lien retained by herself and husband on the land in contro-
versy. Testimony showing that she attended to her usual
household work, traded at the stores and in every way attend-
ed to her business affairs. We do not think that the bare
opinions of non-expert witnesses will overthrow the presump-
tion that the plaintiff was competent to make the conveyances
at the time they were made, especially in view of the testi-
mony of the officers and persons present at the time of the
execution of the same, who testify that plaintiff was sane
at the time, which testimony of the officers aforesaid is found-
ed upon good reasons, founded upon facts, and in view of
these facts and that the full value of the land was demanded
by the plaintiff and paid by the defendant Sayre, we are
forced to hold that the plaintiff was competent to execute the
deeds complained of at the time they were executed.

> "It is well settled that in determining the mental
> capacity of the grantor, the time to be looked at and
> carefully weighed is the time when the deed or other
> instrument was executed." *Doak* v. *Smith*, 93 W. Va.
> 133; *Jarrett* v. *Jarrett*, 11 W. Va. 584; *Woodville* v.
> *Woodville*, 63 W. Va. 286.

Plaintiff in this case, while she shows that she was insane
in 1908, further shows by her own witness Frank Sapp, that
at the time she made the deed to the Sapps, she at least had
lucid intervals, at that time. This and the transactions of
her other business as herein stated, shows at least, that her
insanity, if she was insane, was intermittent and that at times
she was capable of transacting her business. This destroys the
presumption that her former insanity continued.

> "If the malady is occasional or intermittent in its
> nature, the presumption (of continuance) does not arise,
> and he who relies upon insanity proved at another time
> must prove its existence also at the time alleged."
> *McPeck* v. *Graham*, 56 W. Va. 203. Citing 16 Am. &
> Eng. Ency. L. (2d ed.) 606.

We are, therefore, of opinion that the court below erred in
entering the decree in this case and we reverse the lower
court, set aside the decree and dismiss the plaintiff's bill.

*Reversed.*