W. M. ELLISON, *Admr., et al. v.* EDNA LOCKARD

(No. 9653)

Submitted April 3, 1945. Decided May 1, 1945.

E. L. *Eakle*, for appellant.
A. G. *Mathews* and *Lorentz C. Hamilton*, for appellees.

RILEY, JUDGE:

This is a suit in equity by W. M. Ellison, both as administrator and as distributee of the estate of W. A. Ellison, deceased, and others, to cancel an agreement purported to have been executed by W. A. Ellison and defendant, Edna Lockard, during the former's lifetime, conveying all of decedent's property to defendant in consideration of past and future services, on the grounds: (1) That the agreement was not executed by W. A. Ellison; and, if signed by him, (2) that it was at a time when he was mentally incompetent to do so. The trial court (as the final decree recites) found "that at the time when the paper writing

and agreement * * * was purported to be signed and executed * * * W. A. Ellison was of unsound mind and not competent to execute said writing and agreement, and did not possess sufficient memory, understanding and mind to know and appreciate the nature, character and effect of signing and delivering the same and was incapable of entering into said agreement"; and decreed that the same "is hereby set aside, cancelled and held for naught". From this decree defendant prosecutes this appeal.

W. A. Ellison died intestate August 4, 1943, at the age of fifty-two, survived by W. M. Ellison, his father, Rebecca Ellison, wife of Ray Ellison, and Lavina Wesson, his sisters, and J. M. Ellison and R. F. Ellison, his brothers. His mother had predeceased him in 1938. He had always lived in the home occupied by his father and mother. He had been totally blind for ten or eleven years prior to death. In 1934 his mother took the defendant, Edna Lockard, a girl of sixteen, into the home as a domestic, and the latter remained there until August 7, 1943, the Saturday following decedent's death. In addition to other duties defendant attended to decedent's wants, and assisted him in his business transactions, especially during his last years. So far as the record discloses she had never received any remuneration for her services other than board, room and some clothes.

Decedent suffered a paralytic stroke on December 13, 1942. Initially he was rendered unconscious, but regained consciousness after his removal to the hospital at Spencer, where he remained seventeen days. Dr. Gordon, the owner of the hospital in active charge thereof, stated that when admitted to the hospital, decedent "seemed to be confused and clouded" and that "he was sane when he left"; that only the motor not the mind center of his brain was affected. Between the time of leaving the hospital and August 4, when he suffered a second stroke resulting in death, decedent had improved to such an extent physically that he could walk about the house and in the yard; and with the aid of Edna he had continued to transact matters of business. He sold a haystack for fifteen dol-

lars, ten dollars by check and five dollars in work; made a deal to have the grass cut on the shares; renewed a lease with Hope Natural Gas Company on certain property; and shortly prior to death advised Edna against selling certain cattle on an offer of fifty dollars per head, stating that the cattle would bring over a hundred dollars per head at Spencer. On those occasions, he seemed to know what he was doing.

On various occasions both before and after the stroke on December 13, 1942, and in the presence of others, he had indicated that he desired defendant, the only person who seems to have attended to his needs, to have whatever property he possessed.

The paper writing, the execution of which is the basis of this suit, bore date July 20, 1943, and purported to convey to Edna Lockard all of the property, real, personal and mixed, then owned by decedent, in return for past and future services rendered and to be rendered by defendant. This paper was executed on July 31, 1943. On two previous occasions decedent attempted to transfer property to defendant, but at the time of the execution of the last paper remarked that the former memorandums had not been "strong enough."

S. M. Matheney, Roy Metheney and Henry Nicholas were at the house at the time of the execution of the writing. They had been engaged in cutting grass for decedent and had come to the house for the purpose of grinding certain implements. Nicholas having declined the request to be a witness, decedent then called Roy Metheney, and the latter witnessed the execution of the writing. He held the end of the pen while decedent made his mark, and then signed as witness thereto. Defendant then signed, and when the paper was returned to decedent, the latter handed it to defendant. Roy Metheney was of opinion decedent was in his right mind. Although Nicholas was not in the room at the time he knew of the purpose for which Roy Metheney was called in, and he stated that he was in to see decedent following the signing and decedent's "mind seemed as good as it ever was". S. M. Metheney also saw decedent following the sign-

ing, made inquiry at the time concerning the whereabouts of the "sickle rock" and was advised by decedent that it was on the fireboard behind the picture frame, where he found it. According to the last-mentioned visitor, decedent remarked he had a paper fixed up for defendant to have what he had; that he wanted defendant to have his property; that he did not desire his brother "Mat" or his brother-in-law "Ray" to have it; and that he now had his business fixed up. Witness further observed that decedent "talked with a good mind that day all right." The paper writing, which was admitted as part of the deposition of Roy Metheney, shows defendant had it notarized and recorded in the county clerk's office on the 6th day of August, the day of decedent's burial.

There is a stipulation in the record to the effect that J. M. (Mat) Ellison appeared before the County Clerk of Calhoun County, and asked for the appointment of a committee for decedent; that evidence was heard by the clerk; that the clerk found decedent to be incompetent and appointed Hazel Haverty, Mat's daughter, as committee, and took a bond with Mat as surety; that the county court later refused to confirm same because not based on a prior finding of insanity as required by statute. On cross-examination of defendant it appears that the proceeding above was had about the latter part of June or the first of July, 1943; and defendant further testified that notice of this proceeding was not served upon decedent.

There are no allegations of undue influence in the bill of complaint; nor is there any testimony of undue influence in the record.

No evidence was offered by plaintiffs in support of their charge that the agreement was not, in fact, executed by decedent. However, they contend that the testimony of their witnesses, Dr. J. A. Dye, a country physician, seventy-six years of age, and Francis M. King, J. G. King, father of Francis, and Leslie Watkins, neighbors, clearly establishes decedent's incompetency at the time of the paper's execution. Dr. Dye's testimony carries very little weight. He claims to have been the family doctor for years, and that he had attended decedent both prior to and after the

stroke of December 13, 1942. After the latter's return from the hospital and prior to his second stroke on August 4, witness made five visits, the fifth being on July 15. His opinion of decedent's condition is summed up thus: "After he came back he didn't have any mind, didn't know much only at times." Francis M. King, who made the deal with decedent for the haystack during the month of March, says: "There was times that he talked all right but ended up on foolishness." In support of the latter part of the foregoing statement he gives but one illustration: Decedent, had said "tie up the pig to the wagon wheel and feed him". Witness later associated this with the haystack deal in point of time and on cross-examination testified that decedent may have been joking. J. G. King says he "wasn't there so often after return" from hospital. He saw decedent two or three weeks prior to death. Without giving any factual basis for his conclusions, witness said: "Wouldn't want to do business with him." And, further, "His mind wasn't right and it wasn't any time that I saw him." This witness at the time he testified was surety on a bond given by W. M. Ellison, plaintiff in an action of detinue against defendant to recover cattle which she claimed as her own, and had removed from the farm when required to leave the property. Leslie Watkins talked with decedent two or three times after his return from hospital. Once, three weeks prior to August 4, witness in talking to decedent in regard to construction of a line fence, asked the latter if he had any wire, to which decedent answered, "yes." He then told decedent that they had better put wire on the posts, and decedent "mumbled something." He also related another episode regarding "robbing bees", which he unwittingly placed at a time corresponding with decedent's death, and then later retracted, and made it a few days after the "mumbling" above referred to. Watkins had on previous occasions endeavored, without success, to have defendant indicted on claim of illicit relations between her and decedent.

Plaintiffs in their endeavor to support the trial court's finding of incompetency, as set forth in the decree, do not rely exclusively upon the opinion evidence of their wit-

nesses. They call this Court's attention to the following: (1) The finding of incompetency by the county clerk, which was standing on July 31, 1943; (2) Dr. Dye's testimony that he had previously advised defendant of decedent's incompetency; (3) their contention that the writing failed to protect decedent's future interests; and (4) that the testimony generally preponderates in favor of incompetency at time of the purported execution.

The burden was on the plaintiffs to clearly prove the grounds on which they attack the writing. *Teter* v. *Teter,* 59 W. Va. 449, 53 S. E. 779, pt. 1, syl.; *White* v. *Mooney,* 73 W. Va. 304, 80 S. E. 844, pt. 1, syl.

The law presumes that the grantor is sane and possessed of sufficient mental capacity to make a deed at the time of its execution, and the burden of proving that he was not then competent is on the one attacking its validity. *Wade* v. *Sayre,* 96 W. Va. 364, 123 S. E. 59, pt. 2, syl; *Black* v. *Post,* 67 W. Va. 253, 67 S. E. 1072; *Delaplain* v. *Grubb,* 44 W. Va. 612, 30 S. E. 201; and *Buckey* v. *Buckey,* 38 W. Va. 168, 18 S. E. 383. Mere infirmity of mind and body is insufficient to overcome the legal presumption of mental capacity in one who has executed a will, a deed, contract or other instrument. *Doak* v. *Smith,* 93 W. Va. 133, 116 S. E. 691; *Woodville* v. *Woodville,* 63 W. Va. 286, 60 S. E. 140; *Bade* v. *Feay,* 63 W. Va. 166, 61 S. E. 348; *Teter* v. *Teter, supra.* Mere age or infirmity of mind and body is not sufficient to overcome the legal presumption of mental capacity of the grantor. *Burkle* v. *Abraham,* 112 W. Va. 257, 164 S. E. 150.

Since the appointment of the committee by the county clerk was without authority and not confirmed by the county court, it can have no effect upon the establishment of plaintiffs' case, though defendant, Edna Lockard, had either actual or constructive notice thereof. The presumption of capacity in the grantor to dispose of property remains.

The fact that Dr. Dye may have informed defendant of the condition of decedent's mind does not have any bearing on the issues before us. The bill does not allege duress, as we have noted heretofore, nor does it allege that any un-

due advantage was taken of decedent; and there is no merit in the position that the writing did not protect decedent's interest. As heretofore indicated, it was executed in consideration of past and future care.

This brings us to the controlling issue. Have plaintiffs established lack of capacity on the part of decedent to make disposition of his property as of July 31, 1943, the day on which he signed the paper purporting to dispose of same?

That decedent desired defendant to have his property, and intended by the execution of the writing to see that she got it, is amply supported by the evidence. The force and effect of the testimony of the three witnesses, present at or about the time of the actual signing of the paper writing, is that he knew what he was doing, that he actually accomplished his purpose, and was competent to do it. This of itself has more force than mere opinion of parties as to decedent's competency or incompetency at other times, or his conduct or actions at other times. In judging a grantor's capacity to execute a deed, the point of time to be considered is the time of the execution of the deed. *Wade v. Sayre, supra,* pt. 2, syl; *Delaplain v. Grubb, supra.* And the testimony of a subscribing witness is entitled to peculiar weight on that issue. *Burkle v. Abraham, supra.*

The fact that decedent was more or less incapacitated physically, and required the aid of someone in getting around, of itself casts no doubt upon his mental capacity. *Burkle v. Abraham, supra.* Granting that he might have been irrational at times, a fact which the record does not support unless we accept as controlling the bare opinion evidence adduced on behalf of plaintiffs, we find that not a single one of those giving opinions as to decedent's lack of capacity saw him during the period of two weeks immediately preceding the second stroke on August 4, the period in which the paper writing is shown to have been executed. Then, again, no positive evidence was introduced tending to show that on the date of signing, decedent did not know the nature of what he was doing, that he did not know what he was disposing of, and that he did not know to whom he was conveying it.

Dr. Dye does not purport to be a mental expert. In any event, he recognized that decedent had rational periods by his opinion that "* * * didn't know much only at times".

"A nonexpert witness who bases his testimony upon facts and circumstances known to, and related by, him may be permitted to give opinion testimony as to the sanity or insanity of a person whose mental condition is being investigated." 20 Am. Jur., Evidence, Section 852, citing *Graves* v. *Katzen*, 112 W. Va. 467, 164 S. E. 796. J. G. King's testimony, having no factual basis for his opinion as to decedent's mental capacity, does not come within the above rule.

That the grantor is presumed to be capable of disposing of his property is not defeated by common report or reputation, or the imputation of friends or relations or the age or feebleness of the subject, or, in short, by any cause except controlling evidence produced. *Buckey* v. *Buckey, supra; Eakin* v. *Hawkins,* 52 W. Va. 124, 43 S. E. 211. We are of opinion that the plaintiffs' evidence fails completely in its effort to overcome the other evidence of capacity and the presumption of law that decedent was competent to execute the agreement on July 31, 1943.

The decree of the Circuit Court of Calhoun County is, therefore, reversed and the bill dismissed.

*Reversed; bill dismissed.*