# CHARLESTON.

M. C. ARCHER, *Exec., Etc. v.* SOPHRONA KATE STEWART *et als.,*
C. F. KERWOOD, *Appellant.*

(No. 5979)

Submitted February 21, 1928. . Decided February 28, 1928.

EXECUTORS AND ADMINISTRATORS—*Evidence That Father-in-Law Gave Son-in-Law Money and Bonds in Express Payment for Services Prevented Recovery for Their Value by Father-in-Law's Executor.*

Where the nature and extent of services rendered by a son-in-law to his father-in-law enfeebled by sickness and senility, are such that payment therefor must be presumed to have been intended by the parties, uncontroverted competent evidence that the father-in-law before his death had delivered money and bonds to the son-in-law in express payment for such services, will prevent recovery, based on *quantum meruit,* for the value of, such money and bonds in a suit by the executor of the father-in-law against the son-in-law.

(Executors and Administrators, 23 C. J. § 438.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Jackson County.

Suit by M. C. Archer, executor of John Unrue, deceased, against Sophrona Kate Stewart, C. F. Kerwood, and others. From a decree for plaintiff, defendant Kerwood appeals.

*Reversed; bill dismissed as to Kerwood;*
*remanded.*

*J. Luther Wolfe* and *Lewis H. Miller,* for appellant.

LIVELY, JUDGE:

This case involves a controversy between M. C. Archer, Executor of John Unrue, deceased, representing the legatees and devisees under the will, and C. F. Kerwood, a son-in-law of John Unrue, respecting certain money and bonds owned by John Unrue and which came into the hands of Kerwood prior to John Unrue's death. The primary object of the bill filed by the executor is for discovery of the sums of money and property which went into the hands of Kerwood, the disposition of the same, and for a recovery thereof against Kerwood in favor of plaintiff; and for general relief. The bill sets up and exhibits the will of John Unrue dated February 24, 1917, in which a legacy was given to Julius Unrue of $125.00; to the heirs of Josephine Starcher $50.00; to the heirs of Georgia Parsons $25.00; and the residue of the entire estate to the four living daughters of the testator, namely, Ora Pearl Kerwood (wife of defendant C. F. Kerwood), Sophrona Kate Stewart, Ada Rebecca Sayre and Dovie Parsons. The bill says that the deceased, at the time of his death owned a half interest in a lot of land in West Ripley, Jackson county; and that no personal estate whatever came into the hands of the executor to be administered, and that therefore he has no personal estate in his hands out of which to pay the legacies. The bill charges that in the year 1921 defendant Kerwood moved into the residence of John Unrue and took over the management of his affairs until his death on May 13, 1923, and that during that period Kerwood received from Unrue $400.00 in liberty bonds, a check for $444.18 on money of Unrue's in the bank, and pension checks payable to Unrue of $50.00 per month; and also certain fruits, potatoes and the like amounting to $100.00, all of which, it is charged, defendant Kerwood has possession of and should account to the plaintiff therefor; and calls upon defendant to make full disclosure thereof, propounding interrogatories for that purpose.

The answer of Kerwood admits that he and his wife and son, (28 years of age, who worked in a bank in Ripley), moved to the residence of John Unrue in West Ripley from their own home where they were comfortably housed and situated, at

his special instance and request, in order that he could be taken care of in his old age; that he was about 85 years old at the time and was afflicted with a recurrent intestinal trouble, was unable to hold his urine and was afflicted with a nauseous discharge from his nose and required constant attention and care; that none of his daughters or relatives would undertake the service; that he and his wife and son moved into the residence of Unrue about the 1st of October, 1921, and remained in constant care of the old gentleman through his various illnesses until May 13, 1923, when he died, being, the last 63 days of his life, confined to his death bed. The answer makes full disclosure of the bonds and money which came into his hands. Defendant admits having received liberty bonds in the amount of $400.00; a check for $444.18; money derived from the pension amounting to $700.00; stamps to the amount of $100.00, and the balance on a note of $56.00 which defendant owed to John Unrue, amounting in all to $1700.18. And it is averred that these several sums were turned over to him by John Unrue for the services he had performed in taking care of him during his sicknesses and declining years. It is also averred in the answer that defendant furnished sustenance, clothing, shoes, tobacco and other necessities to the old gentleman; that he had paid his taxes and doctor bills, and that he had paid the funeral expenses amounting to $182.32, and had erected to his memory a tombstone or monument at his grave at an expense of $273.00. The amount furnished for sustenance, clothes, shoes, taxes, doctor bills and the like is indefinite because defendant says he took no memoranda thereof.

The main issue developed by the pleadings involves the true relationship between John Unrue and defendant Kerwood. Plaintiff says that Kerwood was acting in a fiduciary capacity and that these moneys were turned over to him in trust; whereas, defendant avers that the money was paid over to him for services rendered and was his, by reason of such services, and that he should not be required to account for the same.

The parties went to proof. The evidence is mainly that of the children of John Unrue relative to the *quantum meruit* of

the services rendered by Kerwood in the premises. The evidence of the daughters and their husbands is to the effect that the services were worth $15.00 per month, taking into consideration the fact that Kerwood lived in the house of John Unrue and the rent thereof was estimated at $15.00 per month. One witness, a neighbor who was disinterested, testified for plaintiff that in his judgment the services were worth $1.00 per day; but it appears that he was not fully cognizant of all of the services which were rendered by Kerwood and his wife while the old gentleman was afflicted with these serious recurrent maladies. On the other hand, there is evidence from defendant and wife and others to the effect that the services rendred were worth more than the amount of money and bonds which Kerwood received; and they detail the services rendered and the occasion therefor. It appears rather conclusively that when the old gentleman was confined to his bed and room from his bowel trouble, that it was impossible for him to hold his fetal excreta and his clothing and bed clothing were continually befouled. It was necessary to wash his bed clothing and wearing apparel separately from the washings of the family, and that Kerwood himself performed that task, sometimes washing the clothing two or three times a day. It appears further that when the old gentleman was not sick he required constant watching because of his old age and infirmities. All this evidence, pro and con, was given in an attempt to show the value of the services rendered. And from this evidence the court found that defendant should account for $769.50, and rendered a decree in favor of the executor for that amount against Kerwood, from which he obtained this appeal and supersedeas. Appellant argues that no amount should be found against him; that the evidence clearly establishes that the moneys and bonds turned over to him were for services performed, and that Unrue in turning over the money to him was placing his own value on those services. On the other hand, appellee says that the presumption of law is that the services were rendered gratuitously; and that even on the basis of *quantum meruit* the court should have rendered a decree in favor of the executor for at least the sum of $1300.00, instead of $769.50.

It appears from the evidence that on October 3, 1921, the wife of John Unrue died. At that time the children had all married and had removed to distant points where they had established homes of their own, with the exception of Kerwood and wife, Ora, who lived in the town of Ripley on property of their own and where he had been conducting a retail grocery business. The question of the care of the old gentleman came up after the death of his wife. One of the sons-in-law proposed that he would move into the property and take care of the father if the real estate worth $2500.00 was turned over to him for his services. That proposition was not acceptable to Unrue, and finally Kerwood and his wife agreed to leave their home and take care of the old gentleman in his home and shortly after the death of the mother did so. There is no evidence of a written contract, and the mouths of Kerwood and his wife as to the agreement for pay for such services were closed and neither one of them attempted to state an agreement. The situation of the parties, the circumstances, the condition of the old gentleman's health, his declining years and his subsequent declarations impel the conclusion that the services of Kerwood were not gratuitous, nor intended to be so. On that point appellee relies upon the principle that where services are rendered by one member to another member of the family standing in close relation of consanguinity, then such services are presumed to be gratuitous, and cite therefor our cases of *Swiger* v. *Evans,* 75 W. Va. 236; *Moran* v. *Moran,* 93 W. Va. 344; and *Keys* v. *Keys,* 93 W. Va. 33. These cases do not apply. It was not incumbent upon Kerwood to take care of his father-in-law. No legal duty devolved upon him in that regard. He was not connected by ties of consanguinity. But was there an agreement or contract between Kerwood and Unrue for payment for his services? We find no express contract. Kerwood could not testify to such an agreement nor did he attempt to do so, although in response to a question on cross-examination he came dangerously near doing so; but probably counsel for plaintiff did not intend to make him his witness on that point. However, as above suggested, it is reasonably clear that there was an implied contract and that the services were not to be per-

formed gratuitously. Upon that point the evidence is that John Unrue impliedly admitted such an agreement, or at least, recognized that Kerwood's services should be remunerated to the extent of the money and bonds which had been turned over to him, and actually did remunerate him by doing so. A daughter of the deceased, and one of the beneficiaries under the will, Dovie Parsons, one of the defendants, testified in relation to a conversation had between them in his last illness as follows: ''Pa called me in the room and told me he wanted to tell me something; he said he had turned his money over to Charley (Kerwood), for taking care of him, and being so good to him; he said Charley had never given him a cross word, and he said they left their home to come there and take care of him and he wanted them well paid, and he said he didn't want anybody to try to hurt Ora and Charley, and he wanted everybody to know what he did and he done the best he could and he didn't go behind the bush about it.'' On cross-examination she strengthened this testimony and was not shaken. She reiterated that her father told her that he had turned *all* of the moneys over to Charley, ''because he had been good to him all of his life and taken care of him and that he didn't want Charley to be hurt about it and he wanted everybody to know.'' It appears that J. F. Puckett, a neighbor, who had lived for five years in close proximity to John Unrue and who was his friend for many more years, was present when this conversation between the daughter and the deceased occurred, and he also was told by Unrue what disposition he (Unrue) had made of his property under the will and stated that Unrue told him then that he was paying or had paid Kerwood for looking after him. Using in part the language of the witness: ''He said Mr. Kerwood was the only one that would seem to pay any attention to him and he didn't seem to know what he would have done if it had not been for him; he said he left his home to come and look after him, and he wanted him paid and he was paying him, and he wanted him paid well and he didn't want him bothered or disturbed by anyone and didn't want them to have anything to say about the paying.'' It is clear that the evidence of Dovie Parsons is admissible because she was testifying against

her own interest. She is corroborated by Puckett who is unquestionably a competent witness. Their evidence was not contradicted or sought to be impeached in any way. We think this evidence is controlling, and compels a decision of the main issue in favor of defendant. It is clear that John Unrue recognized the right of Kerwood to be paid for the services which was shown to be exacting and unusual and that he had turned over these bonds and the money for that purpose, and did not want any of his legatees or devisees to question it. It must be remembered that this conversation with his daughter and witness Puckett was a short time before his death. Unrue by payment, fixed the amount of compensation, and although the trial court may have thought it to be in excess of the services rendered, it cannot be lessened or increased under the principle of *quantum meruit.* The amount, in view of the services, does not shock the conscience. *Bade* v. *Feay,* 63 W. Va. 166. These sums thus delivered were not gifts and are not therefore controlled by the rules of evidence in Sec. 1, Chap. 71, Code, respecting gifts.

The equities are in favor of defendant Kerwood and the decree will be reversed, and the bill dismissed as to him.

*Reversed; bill dismissed as to Kerwood; remanded.*